# IN THE SUPREME COURT OF TEXAS

════════════

No. 13-0158

════════════

Ford Motor Company, Petitioner,

v.

Ezequiel Castillo, Individually, Maria De Los Angeles Castillo, Individually and as Next Friend for A. C. and E. C., and Rosa Silvia Martinez, Individually, Respondents

══════════════════════════════════════════════

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

══════════════════════════════════════════════

**PER CURIAM**

We grant the motion for rehearing, withdraw our opinion and judgment of June 20, 2014, and substitute the following opinion and corresponding judgment.

At issue in this appeal is the legal sufficiency of circumstantial evidence. A jury determined that a settlement agreement was procured by fraud, and the trial court rendered judgment setting the agreement aside. The court of appeals, however, reversed that judgment, holding the circumstantial evidence of fraud in the case legally insufficient. *Castillo v. Ford Motor Co.*, ___ S.W.3d ___ (Tex. App.—Corpus Christi–Edinburg 2013) (mem. op. ). We conclude that the circumstantial evidence in this case is legally sufficient and accordingly reverse the court of appeals' judgment and remand to the court of appeals for further proceedings consistent with this opinion. The cause is remanded to that court for consideration of the factual sufficiency of the evidence.

In 2004, Ezequiel Castillo and other occupants of his Ford Explorer sued Ford Motor Company for injuries sustained in a roll-over accident. The plaintiffs asserted design defects in the Explorer's roof and in its handling or stability. The products-liability trial lasted approximately four weeks. The case was submitted to the jury on a Friday, late in the afternoon. The jury charge included separate liability questions on the two alleged design defects. A damages question was conditioned on an affirmative answer to one or both of the liability questions.

Cynthia Cruz Cortez, a member of the jury, was very interested in being selected foreperson, and the other jurors acquiesced. The jury was dismissed for the weekend less than an hour after deliberations began. The jury resumed deliberations the following Monday morning.

Within two hours, eleven of the twelve jurors had decided the first liability question in Ford's favor. Cortez was the only juror voting against Ford, but she eventually relented, making the first question a unanimous decision. By the end of Monday's deliberations, eight jurors had decided the second question in Ford's favor. Cortez was one of two jurors who voted against Ford, and two jurors remained undecided.

On Tuesday morning, Cortez failed to return for deliberations. According to other jurors and trial counsel for Ford, Presiding Judge Abel C. Limas[1] informed everybody that Cortez had been in the hospital all night with a sick child. Judge Limas dismissed the jurors for the day and announced that deliberations would resume the following morning.

---

[1] Judge Limas is currently serving a 72-month sentence in federal prison for taking bribes from attorneys in exchange for favorable rulings. *Former Judge Abel Limas Gets 72 Months in Prison for Taking Bribes*, FBI.GOV (August 21, 2013), http://www.fbi.gov/sanantonio/press-releases/2013/former-judge-abel-limas-gets-72-months-in-prison-for-taking-bribes.

After the recess was announced, Mark Cantu, one of Castillo's attorneys, called Pete Tassie, Ford's managing counsel, in Michigan to discuss settlement. The two had discussed settlement over several months, but Cantu had refused to budge from his $15 million demand, which Tassie viewed as unreasonable. This day, however, Cantu asked for $8 million to settle, and later reduced his demand to $4 million. Tassie countered with an offer of $1 million. By the end of the day, the parties were less than $500,000 apart, with Cantu demanding $1.96 million, and Tassie willing to pay $1.5 million.

Tassie recalled from the lengthy negotiations that Cantu repeatedly stated that his demand would increase to $3 million if the jury were to send a note about damages. Tassie, who had ten years of experience negotiating for Ford, including several prior dealings with Cantu, found Cantu's comment odd, not only as to its frequency, but also its specificity. Tassie was accustomed to opposing negotiators stating generally that their demands would increase if certain things were to happen, but had never heard such a specific contingency, let alone one that was repeated several times. At the conclusion of the day's negotiations, Cantu told Tassie he would talk to the judge in the morning and that he could expect the judge to put some pressure on him to settle the case.

The next morning, Tassie called Ford's trial counsel, Eduardo Rodriguez, to update him on the significant progress that had been made in negotiations. Tassie, however, did not hear from the judge or Cantu before the jury began deliberating the next morning. Rodriguez informed Tassie that Cantu was not at the courthouse. Tassie thought this was odd because Cantu had not missed a day during the four week trial. He tried to reach Cantu by phone but was unsuccessful.

About 9 a.m., the jury sent a note to the judge asking for clarification on the burden of proof. Then, about 10:30 a.m., the second note of the day was sent to the judge, inquiring: "What is the maximum amount that can be awarded?" Rodriguez immediately called Tassie in Michigan, and, without hesitation, Tassie obtained authority from his supervisor to settle the case for $3 million—the amount Cantu had said the day before he would demand if the jury were to ask a question about damages. About this same time, Cantu, who had been unavailable all morning, called Tassie. Cantu initially stated that his demand should be $10 or $15 million, but quickly agreed to settle the case for $3 million.

Tassie called Rodriguez to tell him the case had settled, and, because of the disturbing note, asked Rodriguez to speak with members of the jury. Ford's attorneys were able to talk to eleven of the jurors, but Cortez left the courthouse without speaking to them. Discussing the case with the other jurors, Ford learned that the jury had not been discussing damages before the settlement, and did not know that Cortez had sent the damages note to the judge. Ford subsequently tried to obtain a statement from Cortez but was not successful. Ford did obtain affidavits from most of the other jurors, who repeated what they told Ford on the day the case settled. After completing its investigation, Ford refused to pay the $3 million to Castillo, who then sued Ford for breach of contract.

In its defense to the settlement, Ford asserted fraudulent inducement, unilateral mistake, and mutual mistake. However, Judge Limas prohibited Ford from conducting discovery or offering evidence of the jury's deliberations in the products-liability trial, including the signed affidavits from the jurors. Judge Limas subsequently granted summary judgment, and the court of appeals affirmed.

4

*Ford Motor Co. v. Castillo*, 200 S.W.3d 217 (Tex. App.—Corpus Christi–Edinburg 2006, pet. granted). This Court reversed and remanded to permit Ford to conduct discovery and offer evidence from the jurors in the products-liability suit, because, *inter alia*, the circumstantial evidence indicated outside influence. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 666 (Tex. 2009) ("Discovery involving jurors will not be appropriate in most cases, but in this case there was more than just a suspicion that something suspect occurred—there was some circumstantial evidence that it did.").

On remand, a new jury heard testimony from, among others, Tassie, Cantu, Rodriguez, and most of the jurors from the products-liability trial, including Cortez. Several of the jurors testified that Cortez kept trying to bring up the damages issue on her own, and sent the note against their specific requests that she not do so. These jurors also testified that all other notes were sent by unanimous agreement. One juror testified that on the morning the case settled—after the day-long recess caused by Cortez's absence—Cortez arrived in a "very happy, very upbeat" mood, and told the other jurors, "This will be settled today."

Unlike the other jurors who testified, Cortez could not recall any of the pertinent details of the trial or the jury deliberations. Notably, Cortez could not recall why she sent the note in question, why exactly she did not show up for the second full day of deliberations, or why she had left the courtroom so quickly after the settlement was announced. Cortez also could not recall her cell phone number or carrier at the time, but signed a release permitting Ford to search for all cell-phone records registered to Cortez during the time of the products-liability trial, using her name, address, and date of birth. After denying that she spoke with any attorneys during the trial, Cortez was asked to explain a phone call on September 21, 2004 to the purported private cell phone of attorney and State

5

Representative Jim Solis.[2]  Initially, Cortez explained that her husband probably made the call. When other evidence made that explanation unlikely,[3] she speculated that the phone records were those of another Cynthia Cortez.

After hearing all of the evidence, the jury found the settlement agreement invalid because of fraudulent inducement and mutual mistake.  The trial court rendered a take-nothing judgment and Castillo appealed.  The court of appeals reversed the judgment, concluding that the evidence was legally insufficient to support a jury verdict.  ___ S.W.3d at ___.

A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).  In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict. *Id.* at 822.

When reviewing all of the evidence in a light favorable to the verdict, "courts must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other

---

[2] Jim Solis is currently serving a 47-month sentence in federal prison after confessing to his role in Judge Limas' extortion scheme, wherein Solis would operate as a middle man between Judge Limas and the attorneys trying cases in Limas' court. *Former Texas Representative Jim Solis Gets 47 Months in Prison for Limas Extortion Scheme,* FBI.GOV (August 02, 2013), http://www.fbi.gov/sanantonio/press-releases/2013/former-texas-representative-jim-solis-gets-47-months-in-prison-for-limas-extortion-scheme.

[3] Because Cortez's husband was a high school football coach at the time, Ford pointed out to Cortez that the same number making the purported call to Jim Solis also made five different phone calls between 6:50 and 8:00 p.m. on Friday, September 24. Cortez admitted that, as a high school football coach, her husband should not have been making and receiving phone calls during a game, but explained that he could still do so because he was an assistant coach, who worked from a box, rather than on the sidelines.

6

inferences in their legal sufficiency review." *Id.* at 821. When reviewing circumstantial evidence that favors the verdict, we must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *Id.* at 813-14. If circumstantial evidence, when viewed in light of all the known circumstances, is equally consistent with either of two facts, then neither fact may be inferred. *Id.* at 813-14. But where the circumstantial evidence is not equally consistent with either of two facts, and the inference drawn by the jury is within the "zone of reasonable disagreement," a reviewing court cannot substitute its judgment for that of the trier-of-fact. *Id.* at 822.

To find fraudulent inducement, the jury was instructed that it needed to find evidence of five elements: (1) a material misrepresentation; (2) sent by or at the direction of the plaintiffs or their agents or representatives with knowledge it was false; (3) with the intent that Ford Motor Company rely on the representation; (4) that Ford Motor Company did not know the representation was false and actually and justifiably relied upon the representation; and (5) that Ford Motor Company detrimentally relied on the representation by entering into the settlement agreement. Only the first four elements are in dispute.

On the first element, the jury was instructed that a material misrepresentation is a "false statement of fact." Castillo argues that the note sent by Cortez asked a question, and therefore cannot be a false statement of fact. Although the note does ask a question, statements of fact are clearly implied. A jury note, asking about the maximum amount of damages, implies that the jury is deliberating damages and that it intends to award the maximum amount. It also implies that the note is from the jury collectively. The evidence indicates that neither implication was true.

7

According to the testimony of several jurors, the jury was not actually deliberating damages at the time of Cortez's note, and several jurors specifically told Cortez not to send a note about damages. Because the note implies material statements that were false, we conclude that some evidence exists of the first element of fraudulent inducement.

On the second element, Ford was required to produce evidence establishing that the note was sent by or at the direction of the plaintiffs or their agents or representatives with knowledge it was false. Ford's theory was that Cantu, as plaintiffs' representative, directed Cortez to send the note.

Castillo argues that this element presents a *Casteel* problem. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). We held in *Casteel* that harmful error will be presumed when a broad-form jury question contains both valid and invalid theories of liability, and the jury's answer fails to specify on which theory it rests. *Id.* at 388. Castillo argues that the doctrine of presumed harm is triggered with this element, because the word "or" requires Ford to present legally sufficient evidence of each possible way the element might be established. The argument misunderstands *Casteel. Casteel* issues do not arise in every situation where a jury has more than one legal theory to choose from when answering a single question. Instead, *Casteel* issues arise when one of the choices presented to the jury on a single, indiscernible question is legally invalid. *Id.* at 388–89. Castillo does not argue the legal invalidity of the element and thus *Casteel* does not apply.

As to the sufficiency of the evidence, the court of appeals held that the only evidence supporting the jury's finding on this element was Cantu's statement the night before that his demand would increase to $3 million in the event of a jury note about damages. The court of appeals found this circumstantial evidence too meager to support the verdict because Cantu's statement was

8

"consistent with the custom of plaintiff's attorneys," and was just as likely coincidence as it was knowledge that Cortez would be sending the fraudulent note. *Castillo*, ___ S.W.3d at ___.

Castillo agrees that the evidence of this element is too meager to support the jury's verdict and amounts to nothing more than mere suspicion or surmise, citing *Joske v. Irvine*, 44 S.W. 1059 (Tex. 1898), and *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925 (Tex. 1993). In *Joske*, the only evidence offered to show that the defendant had "requested or directed" the plaintiff's unlawful arrest was that the defendant had called the police to investigate the whereabouts of his missing property and spoken with officers shortly before the plaintiff was arrested. 44 S.W. at 1063. We held, "[i]t would be against reason to hold that the mere fact that a citizen has called upon the officer of the law to search for and recover his lost or stolen property will authorize the inference that he requested or directed the arrest subsequently made." *Id.* And in *Browning-Ferris*, we held that no evidence showed that the company intentionally interfered with a contract the plaintiff had with the Highway Department, because no proof linked Browning-Ferris to any of the evidence the plaintiff offered. 865 S.W.2d at 927.

The cases are similar to this case only in that they rest almost entirely on circumstantial evidence. Thus, in *Browning-Ferris* we noted that "[b]y its very nature, circumstantial evidence often involves linking what may be apparently insignificant and unrelated events to establish a pattern." 865 S.W.2d at 927. There was not enough evidence in *Joske* to establish a pattern, and the pattern, if any, in *Browning-Ferris* did not implicate the company. But here, there is enough circumstantial evidence to establish a pattern—a pattern that reasonably implicates Cantu in Cortez's fraudulent scheme to send the note.

9

Unlike the tortious-interference claim in *Browning-Ferris* or the unlawful arrest in *Joske*, in cases of fraud, "[i]t is not often that any kind of evidence but circumstantial evidence can be procured." *Thompson v. Shannon*, 9 Tex. 536, 538 (1853). And circumstantial evidence must be evaluated in light of all the known circumstances, not merely in isolation. *City of Keller*, 168 S.W.3d at 813–14.

Contrary to the court of appeals' view, the trial evidence did not establish that Cantu's comments the day before the settlement were customary of plaintiff's attorneys, but rather the opposite. Tassie, who had negotiated for Ford for more than ten years, including several prior dealings with Cantu, had never heard such a specific contingency. Moreover, neither Cantu nor any of the other attorneys involved in the case had ever seen such a jury note before. Yet Cantu's comments forecast such a note and elaborated on the effect it would have on settlement negotiations. But the unusual nature and prescient timing of Cantu's statement is not the only circumstantial evidence supporting the jury's finding.

On the brink of a Ford victory, Cortez precipitated a day-long recess because of some serious illness or injury to one of her two children. At the trial of this case, however, Cortez could not recall the illness or injury that kept her at the hospital all night. The same day, Cantu, who had refused to lower his settlement demand below $15 million during weeks of previous negotiations, became more agreeable, reducing his demand to less than $2 million in just a matter of hours. Moreover, even after the surprising jury note inquiring as to the maximum amount of damages it could award in a case alleging damages of $35 million, Cantu remained agreeable to a settlement of less than ten percent of that amount. Viewing this circumstantial evidence in light of all the surrounding circumstances,

10

the jury could reasonably infer from the evidence that Cortez initiated the recess in order to give Cantu more time to negotiate a settlement before the jury foreclosed that possibility.

The inferences become stronger when the circumstantial evidence raises the inference of fraud, and the parties alleged to have engaged in the fraud fail to offer any proof of their legitimate or honest motives. *Thompson*, 9 Tex. at 538. Here, the explanations offered for Cantu and Cortez's unusual and apparently coordinated conduct were lacking.

For instance, Cortez was unwilling to offer any explanation for her actions. Even when she was summoned to testify, she offered no explanation, claiming instead that she could not remember any of the relevant details of the trial or deliberations. As for Cantu, he denied ever making the prediction about the note, instead admitting that it would have been unreasonable to make such a statement. He further justified his willingness to discount the extremely favorable note, and accept a fraction of his original demand, on fear that one of his expert's testimony might provide Ford a fruitful appellate argument. While this concern possibly explains his settlement preference, it does not explain his willingness to give Ford such an extreme discount of the damages pled. The circumstantial evidence here is some evidence from which the jury could have reasonably inferred collusion between Cortez and Cantu in producing the fraudulent note.

Having found evidence that Cortez colluded with Cantu, who unquestionably knew that jury notes would be shown to Ford's attorneys, we necessarily find evidence of the third element—that Cortez sent the fraudulent note with the intent that Ford rely upon it.

As to the fourth element—that Ford did not know the representation was false and actually and justifiably relied upon the representation—there is legally sufficient evidence of reliance for the same reasons we have found some evidence of a material misrepresentation. Castillo argues that any reliance on the note which induced Ford to enter the settlement was unjustified because Ford could not assume that the note containing the damages question indicated that the jury had reached any particular determination in the sequence of its deliberations nor could Ford assume that the note indicated the views of the jury collectively. As discussed above, however, the note did impliedly state these very facts that the jury was deliberating damages and intended to award the maximum amount, as well as that the note was from the jury collectively. Accordingly, because there is some evidence that Ford had no knowledge that these implications were false, there was some evidence that Ford was justified to rely on these implications in entering the settlement agreement.

Because the evidence is legally sufficient to support the jury's verdict, we grant the petition for review and, without hearing oral argument, reverse the court of appeals' judgment and remand to the court of appeals for review of Castillo's factual sufficiency challenge. TEX. R. APP. P. 59.1.

Opinion Delivered: October 3, 2014