

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00276-CV

IN THE INTEREST OF K.R. AND
N.R., CHILDREN

----------

### FROM THE 442ND DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 2010-61172-393

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In three issues, Appellant Mother appeals the trial court's judgment, which

denies her request for standard possession and modifies the amount of child

---

[1]*See* Tex. R. App. P. 47.4.

support paid by Appellee Father. We affirm in part and reverse and remand in part.

## II. Factual and Procedural Background

The trial court signed the agreed divorce decree on July 7, 2011, setting up child support and possession for the parties' two children, K.R. (age ten at the time) and N.R. (age four at the time). In June and July 2011, while the divorce was pending, N.R. was tested for autism. N.R.'s initial special education services review with Frisco ISD was on July 27, 2011, and he started going to a special education school, Monday through Friday from 7:40 a.m. to 10:30 a.m., while K.R. attended elementary school from 7:50 a.m. to 3 p.m.

### A. Terms of the 2011 Decree

The trial court appointed the parents as joint managing conservators and gave Mother the exclusive right to designate the children's primary residence "within 20 miles of Boals Elementary School," which is in the Frisco ISD. The agreed decree also set out a nonstandard possession order, which the trial court determined was in the children's best interest "due to the parties' work schedules."

In the nonstandard possession order, the trial court provided that Father would have possession of the children:

1.      Each Friday, beginning at 6:00 p.m., until the following Monday at 6:00 p.m.

2.      If [Mother] provides notice to [Father] by 5:00 p.m. on any Friday that she will be working the Emergency Room on the

2

following Tuesday, then [Father] shall instead have possession of the children that Friday, beginning at 6:00 p.m., until the following Sunday at 6:00 p.m. and from 6:00 p.m. that Tuesday until school resumes the following morning.

3. Holidays - The parties shall come to a mutual agreement as to holiday possession to allow the children to see each party for a portion of school-recognized holidays.

4. [Mother] shall have possession of the children at all times not specifically provided in this order.

The decree also included a right of first refusal: If one of the parents would be absent for more than 24 hours while the children were in his or her care, the other parent would have the right to care for the children during that absence. Mother agreed to nonstandard possession because she had started working weekends in anticipation that N.R. would need special arrangements because of his autism.

The decree provided for Father to pay child support to Mother in the amount of $600 per month and to pay the children's health insurance "at a reasonable cost of $502.19."

**B. Child Support Review Order**

On October 29, 2014, an associate judge signed a child support review order. *See generally* Tex. Fam. Code Ann. §§ 233.001–.029 (West 2014 & Supp. 2015). In the order, the associate judge found that Father's gross monthly resources were $6,162 and that his net monthly resources were $4,469.39. Applying the statutory 25% for child support, Father was ordered to pay $1,117 in monthly child support starting November 1, 2014.

3

## C. New Trial Motion

Father moved for a new trial, complaining that applying the statutory child support guidelines to him would be inappropriate, unjust, and not in the children's best interest because the amount of child support in the divorce decree was agreed to using different calculations based on the parties' and children's circumstances and the agreed nonstandard possession schedule.[2]

Mother then filed a cross-petition to modify the child support amount in the original decree, alleging, among other things, that the circumstances of the children or the parties had materially and substantially changed since the date of rendition and that an increase in child support would be in the children's best interest. *See id.* § 156.401 (West Supp. 2015). She also asked for modification from nonstandard to standard possession. *See id.* §§ 153.311–.312, 156.101 (West 2014).

On January 6, 2015, the trial court held a hearing, issued an order setting aside the October 2014 child support review order, and reset all remaining issues for a final hearing in March. After the hearing before an associate judge, Mother filed a request for de novo trial on certain issues, including (1) the amount of child support and (2) possession of the children.

---

[2]Father did not indicate in his motion what calculations were used.

4

**D. De Novo Trial**

A few months later, the trial court granted the modification of child support in part, ordering Father to pay Mother $792.50 per month in child support, and denying the remainder of Mother's requests. Mother filed a request for findings in the child support order, *see* Tex. Fam. Code Ann. § 154.130(a) (West 2014), and the trial court set out the following statement on guidelines in the order:

> In accordance with Texas Family Code section 154.130, the Court makes the following findings and conclusions regarding the child support order made in open court in this case on April 22, 2015:
>
> 1. The application of the percentage guidelines in this case would be unjust or inappropriate.
>
> 2. The net resources of [Father] per month are $6,582.22.
>
> 3. The gross resources of [Mother] per month are $4,833.33.
>
> 4. The percentage applied to the first $8,550 of [Father's] net resources for child support is 12.04 percent.
>
> 5. The specific reasons that the amount of support per month ordered by the Court varies from the amount computed by applying the percentage guidelines of section 154.129 of the Texas Family Code are: the Court applied the percentage previously agreed to by the parties to [Father's] current income.

Mother moved for a new trial, objecting to the amount of child support because (1) the 2011 decree never mentioned any percentage, (2) the parties never agreed to a percentage but rather to an amount, $600, and (3) the trial court made a math error calculating its percentage. Mother also argued that the evidence at trial showed that while Father's income and the children's expenses

5

had increased, her income had decreased. She complained that the trial court had abused its discretion by awarding less child support than she needed and by refusing to order standard possession.

### III. Discussion

Most appealable issues in family law cases are evaluated for an abuse of discretion, *see Herzfeld v. Herzfeld*, No. 05-10-01298-CV, 2012 WL 6061772, at *2 (Tex. App.—Dallas Dec. 6, 2012, no pet.) (mem. op.), and, indeed, this is the standard of review applicable to the issues Mother raises here.

### A. Standard of Review

A trial court abuses its discretion if it acts without reference to any guiding rules or principles, that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). And it abuses its discretion if it fails to analyze the law correctly or misapplies the law to established facts. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

In our review of family law matters under the abuse of discretion standard, legal and factual sufficiency are not independent grounds of error but are relevant factors in deciding whether the trial court abused its discretion. *See In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g); *see also Herzfeld*, 2012 WL 6061772, at *2; *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.). In determining whether there has

6

been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.); *W.M.*, 172 S.W.3d at 725; *T.D.C.,* 91 S.W.3d at 872. "The traditional sufficiency review comes into play with regard to the first question. With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision." *Newell v. Newell*, 349 S.W.3d 717, 721 (Tex. App.—Fort Worth 2011, no pet.) (quoting *W.M.*, 172 S.W.3d at 725 (footnote omitted)).

Regarding sufficiency of the evidence, we may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable

7

factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## B. Child Support

In her first issue, Mother argues that the trial court abused its discretion by acting without reference to any guiding rules or principles in determining the amount of child support.

A trial court's child support order will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re K.R.A.*, No. 02-13-00154-CV, 2014 WL 1691808, at *3 (Tex. App.—Fort Worth Apr. 3, 2014, no pet.) (mem. op. on reh'g). We review the evidence in the light most favorable to the child support order and indulge every presumption in favor of the trial court's ruling. *In re V.L.K.,* No. 02-10-00315-CV, 2011 WL 3211245, at *2 (Tex. App.—Fort Worth July 28, 2011, no pet.) (mem. op.).

8

Family code section 154.130 requires findings on monthly net resources when, as here, the trial court orders an amount of child support that varies from the statutory percentage guidelines. *See Walker v. Walker*, No. 02-13-00229-CV, 2014 WL 2619147, at *4 (Tex. App.—Fort Worth June 12, 2014, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 154.130(a)(3)); *see also In re A.M.P.*, 368 S.W.3d 842, 846–47 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Though the trial court is not required to follow the guidelines, it must make certain fact findings if the amount of child support it orders varies from the amount computed by applying the percentage guidelines under Texas Family Code sections 154.125 or 154.129, as applicable.").

Section 154.130(b) is very specific about the required findings. *See* Tex. Fam. Code Ann. § 154.130(b). It provides,

> If findings are required by this section, the court shall state whether the application of the guidelines would be unjust or inappropriate and shall state the following in the child support order:
>
> "(1) the net resources of the obligor per month are $_____;
>
> "(2) the net resources of the obligee per month are $_____;
>
> "(3) the percentage applied to the obligor's net resources for child support is _____%; and
>
> "(4) if applicable, the specific reasons that the amount of child support per month ordered by the court varies from the amount computed by applying the percentage guidelines under Section 154.125 or 154.129, as applicable."

*Id.*; *see Finley v. Finley*, No. 02-11-00045-CV, 2015 WL 294012, at *6 (Tex. App.—Fort Worth Jan. 22, 2015, no pet.) (mem. op.) ("[I]f the child support

9

amount varies from the amount computed by applying the percentage guidelines in the family code, the trial court must state specific reasons for ordering that amount of child support.").

In determining whether application of the guidelines would be unjust or inappropriate under the circumstances, section 154.123 provides that the court shall consider evidence of all relevant factors, including (as appropriate here) the children's ages and needs; the parents' abilities to contribute to the children's support; any financial resources available to support the children; the amount of time of possession of and access to the children; the amount of the obligee's net resources; child care expenses incurred by either party in order to maintain gainful employment; the amount of other deductions from wage or salary income; provision of health insurance and payment of uninsured medical expenses; special or extraordinary educational, health care, or other expenses of the children; the cost of travel to exercise possession of and access to the children; and "any other reason consistent with the best interest of the child[ren], taking into consideration the circumstances of the parents." Tex. Fam. Code Ann. § 154.123 (West 2014).

The heart of Mother's argument on appeal with regard to her first issue is that the trial court had no basis on which to determine—as it did in its section 154.130(b) "specific reasons" finding—that the parties had previously agreed to 12.04% of Father's income for child support when there was no evidence of a percentage previously agreed to by the parties or an agreement between them

10

as to how the amount of child support was computed. That is, she challenges the sufficiency of the evidence to support this finding, directing us to the language in the final decree, which she correctly points out "just states that child support is to be $600.00 and does not state how that amount was determined," and her testimony that she did not know how child support had been calculated.

When Father's counsel asked Mother how the $600 child support amount had been calculated, Mother said that she thought it had been something like "comparing the two incomes and taking a difference or something of that nature." Mother further stated that because Father had been making around $86,000 at the time of divorce, $600 per month would have been less than 10% of his income. The remaining evidence in the record on this issue came from Father, who responded, "Yes," to his counsel's question, "The $600, was that about 12% of your net income?" Neither party testified that they had agreed that child support would be calculated based on a percentage of Father's income.

Mother also argues that Father's 2011 net income was never entered into evidence, preventing the trial court from being able to "determine that $600.00 was 12.[0]4 percent of his net income." Father responds that, using the numbers provided by Mother in her brief, *see* Tex. R. App. P. 38.1(g),[3] and applying the

---

[3]In her brief, Mother states that Father made $87,757 in 2011, and from this amount, she computes his monthly gross income as $7,313, which she states "yields net resources in the amount of $5,592.40" after applying the 2011 Attorney General's tax chart. *See* "Office of the Attorney General 2011 Tax Charts," *available at* https://texasattorneygeneral.gov/files/cs/2011taxchart.pdf (last visited June 6, 2016).

$502.19 per month in children's health insurance ordered in the decree (for which Mother failed to account) to his net monthly income, his net monthly resources in 2011 were $5,090.21. He then concludes "[t]he percentage calculation is off by .25 percentage points from 12.04 percent." That is, Father appears to acknowledge that the trial court made a math error in the 2015 judgment.

Based on the above, we agree with Mother that the trial court did not have legally and factually sufficient evidence upon which to determine that the parties had previously agreed to 12.04% of Father's net monthly resources as child support. *See Ford Motor Co.*, 444 S.W.3d at 620; *Pool*, 715 S.W.2d at 635; *cf. Walker*, 2014 WL 2619147, at *4 (holding that the evidence was sufficient to support the trial court's finding that $1,000 per month was within the statutory child support guidelines and thereby did not require section 154.130 findings).[4]

---

[4]We note that although Mother does not specifically raise complaints about the trial court's other section 154.130(b) findings, we cannot determine from this record how the trial court calculated the other numbers that it used. *Cf. In re T.N.H.*, No. 02-06-00074-CV, 2007 WL 495162, at *8 (Tex. App.—Fort Worth Feb. 15, 2007, no pet.) (mem. op.) (holding no preservation when parent did not object to trial court's failure to make a finding on obligee's net resources). The trial court found that Father's present net monthly resources were $6,582.22, which is $420.22 higher than the $6,162 amount listed in Father's pay receipts as his base pay per month (and the amount found by the associate judge in October 2014). And instead of including Mother's "net resources" pursuant to the statutory-findings requirement, it listed Mother's "*gross* resources," which would reflect a higher dollar amount. *Cf.* Tex. Fam. Code Ann. § 154.130(b). Further, while the statute requires that the findings state the percentage applied to the obligor's net resources, in its findings, the trial court stated, "The percentage *applied to the first $8,550 of [Father's] net resources* for child support is 12.04 percent." [Emphasis added.] 12.04% of $8,550 is $1,029.42, not the monthly amount actually ordered by the trial court—$792.50—thus this finding appears to be contrary to both applicable family law and the laws of mathematics. *Compare*

12

Because the trial court ruled without supporting evidence for this finding, it abused its discretion. *See Garcia*, 363 S.W.3d at 578. Therefore, we sustain Mother's first issue.

## C. Possession

In her second and third issues, Mother argues that the trial court abused its discretion by finding insufficient evidence to show a material and substantial change in circumstances had occurred with regard to the issue of access to and possession of the children and by finding insufficient evidence to show that the requested modification of access to and possession of the children was in the children's best interest. *See* Tex. Fam. Code Ann. § 156.101(a).

### 1. Applicable Law

We review the trial court's decisions on custody, control, possession, and visitation matters for an abuse of discretion. *Newell*, 349 S.W.3d at 720; *M.M.M.*, 307 S.W.3d at 849; *see Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *W.M.*, 172 S.W.3d at 724. The trial court may modify possession if the modification would be in the child's best interest *and* the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the order's rendition. *See* Tex. Fam. Code Ann. § 156.101(a)(1)(A).

---

*id.* § 154.130, *with id.* § 154.125 ("Application of Guidelines to Net Resources"), *and id.* § 154.126 ("Application of Guidelines to Additional Net Resources") (West 2014).

13

The best interest of the child shall always be the primary consideration of the court in determining the issues of possession of and access to the child. *Newell*, 349 S.W.3d at 721 (citing Tex. Fam. Code Ann. § 153.002 (West 2008)). There is a rebuttable presumption that the standard possession order provides reasonable minimum possession for a parent named as a joint managing conservator and is in the child's best interest. *Id.* (citing Tex. Fam. Code Ann. § 153.252 (West 2008)). If special circumstances make the standard possession order unworkable or inappropriate, however, the trial court shall render an order that grants periods of possession of the child as similar as possible to those provided by the standard possession order. *Id.* (citing Tex. Fam. Code Ann. § 153.253 (West 2008)). In deviating from the standard possession order, the trial court may consider the age, developmental status, circumstances, needs, and best interest of the child, the circumstances of the managing conservators, and any other relevant factor. *Id.* (citing Tex. Fam. Code Ann. § 153.256 (West 2008)).

### 2. Evidence

Two years before the trial, Mother moved from an apartment in Frisco to a house in Prosper.[5] Mother married J.S. in April 2014.[6] At the time of the trial, in

---

[5]Mother said that she bought the house in Prosper because she could not afford a house in Frisco.

[6]While material changes *may* include marriage by one of the parties or a change in the home surroundings, *see Arredondo v. Betancourt*, 383 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, no pet.), even if a party

14

2015, Mother no longer worked weekends and instead worked Monday through Friday because N.R. had finished with the special education school and was now in regular elementary school. K.R. was in middle school. Both children still attended school in the Frisco ISD but lived with Mother in Prosper.

Mother said that she and the children left the house in Prosper at 7:15 a.m. With traffic, they arrived at the school in Frisco by 7:45 a.m., and then she went to work. Depending on Mother's work schedule, she or her mother would pick up the children after school. The children's schools released at different times, necessitating more than one trip.[7]

Once they were home with Mother, both children had homework. After homework, they had dinner, then "by 7:30, it's take a bath and it's time to go to bed." Mother said that she and the children only had "maybe 30 minutes" to just sit and talk. Mother said that she would love to have time on weekends to plan some outings and have some fun with the children.

Mother testified that a standard possession order would give her some weekends with the children, which would allow her to spend some "laid-back"

shows that these are material and substantial changes, she must still show that modifying possession would be in the children's best interest. *See* Tex. Fam. Code Ann. § 156.101(a).

[7]Mother noted that if the children could attend school in Prosper, they would not have an hour or so in the car each day. In the 2011 decree, Mother was awarded the exclusive right to designate the children's primary residence "within 20 miles of" the children's Frisco ISD elementary school. At the conclusion of the trial, the trial judge counseled Mother to change the children's school to Prosper since she had the right to designate their primary residence.

15

quality time with them. She further testified that a standard possession order would allow Father to have some designated time in the summer and the holidays would already be decided by the court, so they would not have to come to any agreements. Mother pointed out that in addition to giving her some weekends with the children, the standard possession order would give Father thirty days with the children in the summer, every other Thanksgiving, part of every Christmas, and every other spring break, which he did not have under the current arrangement and which would be in the children's best interest.[8]

During cross-examination, Mother acknowledged that she had the children four days a week, including over Thanksgiving, Christmas, and during the summer, and that they had dinner together at night. She also agreed that stability was important for N.R. because of his autism. And she agreed that she could attend the children's activities on the weekend and said that she usually did.

Father's base schedule at work was 7:30–4:00, Monday through Friday, and he was "on call" twelve days a month.[9] Father explained that being "on call" meant only that he would have to work for "usually very short periods of time" on the weekends. If he was on call on a weeknight, it just meant that he stayed late.

---

[8]Father said that before the suit was filed, it had always been "pretty easy" for him and Mother to agree to a visitation schedule for holidays and summer.

[9]Mother said that she did not get the children when Father worked on weekends.

Father was on a schedule of being on call two weekends one month and then one weekend the next. He was paid for a three-hour minimum when called in on the weekend and tried to get out under the minimum. Father's commute was 29 miles each way, and he said that if he had standard possession, he did not know how he could "make that work" with having the children every Thursday evening.

Father's time records showed that through 2014, there were fifteen weekends when he was on call and was actually called in, and from January 2015 to the first part of March, there were three occasions when he was on call and actually called in. Father's time records were admitted into evidence and showed the following:

- On Saturday, February 1, 2014, he worked approximately an hour and a half, from 6:10 p.m. to 7:39 p.m.

- On Saturday February 8, 2014, he worked approximately three hours, from 1:01 p.m. to 4:18 p.m.

- On Saturday, March 1, 2014, he worked approximately six hours, from 4:30 p.m. to 10:53 p.m.

- On Sunday, March 2, 2014, he worked approximately two hours, from 12:07 p.m. to 2:04 p.m.

- On Saturday, April 19, 2014, he worked approximately three hours, from 5:47 p.m. to 9:04 p.m.

- On Friday, May 23, 2014, he worked approximately eight and a half hours, from 2:07 a.m. to 7:56 a.m. and then from 4:30 p.m. to 7:47 p.m.

- On Saturday, May 24, 2014, he worked approximately three and a half hours, from 10:09 a.m. to 11:52 a.m. and again from 12:06 p.m. to 1:43 p.m.

17

- On Sunday, June 8, 2014, he worked approximately three and a half hours, from 8:42 a.m. to 12:13 p.m.

- On Friday, July 18, 2014, he worked approximately five hours, from 4:30 p.m. to 9:38 p.m.

- On Sunday, July 20, 2014, he worked approximately four hours, from 3:58 p.m. to 8:08 p.m.

- On Friday, August 15, 2014, he worked approximately four hours, from 4:00 p.m. to 7:54 p.m.

- On Saturday, August 16, 2014, he worked approximately five hours, from 1:37 p.m. to 6:27 p.m.

- On Saturday, August 30, 2014, he worked approximately two hours, from 12:42 p.m. to 2:20 p.m.

- On Sunday, August 31, 2014, he worked approximately two hours, from 11:27 p.m. to 1:49 a.m.

- On Saturday, September 13, 2014, he worked approximately two and a half hours, from 7:56 a.m. to 10:31 a.m.

- On Saturday, October 18, 2014, he worked approximately eight hours, from 3:22 p.m. to 11:38 p.m.

- On Friday, November 7, 2014, he worked approximately half an hour, from 7:55 p.m. to 8:22 p.m.

- On Saturday, January 3, 2015, he worked approximately an hour and a half, from 10:48 a.m. to 12:09 p.m.

- On Saturday, February 7, 2015, he worked approximately two hours, from 4:22 p.m. to 6:32 p.m.

- On Saturday, February 21, 2015, he worked approximately three and a half hours, from 12:47 p.m. to 4:08 p.m.[10]

---

[10]The records further showed that on Friday, March 27, 2015, Father worked from 7:58 p.m. to 9:34 p.m.; on Saturday, March 28, 2015, he worked

18

Father said that according to the 2011 possession schedule, he had possession of the children from 6 p.m. on Friday until 6 a.m. on Monday. His adult stepdaughter—Mother's daughter—lived in Father's house with her husband and baby, and she took the children to school on Mondays. Father said that when he got the children on Fridays, they would usually go get something to eat and then watch TV or go see a movie; he cooked on Saturday and Sunday nights. Father said that sometimes the children liked to stay home with their sister and the baby.

On Saturday mornings, N.R. participated in his Allstars program[11] at 10 a.m. so they would get up and have breakfast while K.R. slept, and then Father would drop N.R. off at Allstars, and he and K.R. would go to the gym or do a few things around the house before picking N.R. up at noon. Father stated,

> We usually find time to -- we go do something together. We'll go to the park or we'll -- we might go to a movie or we might -- [K.R.] likes to spend the night at his friend's house or we have a friend spend the night. [N.R.] always likes it when [K.R.'s] friends come spend the night.
>
> Sunday -- Sunday if I -- the weekends I'm on call, we don't go to church, we go to church the other weekend. We come back and, you know, make -- do a little -- [N.R.] and I will -- might do some

---

from 7:26 p.m. to 8:38 p.m.; and on Sunday, April 19, 2015, he worked from 8:17 a.m. to 12:24 p.m. and from 6:44 p.m. to 9:23 p.m.

[11]Father explained that the Allstars program was a leadership program for autism spectrum children and that N.R. had been attending it since 2012 and went nearly every Saturday.

reading or do a little writing. We watch some TV, go to the park. I mean, you know, we just -- we have a lot of fun, you know.

Father added that K.R. had homework every weekend that he had to do at Father's house. Father said that most of the time he spent with the children was quality time but "not necessarily fun." Father said that he had had to drive a lot when K.R. had two jazz band programs on the same Saturday and N.R. had his autism program.

### 3. Analysis

Based on this record, which provides some evidence to support the conclusion that leaving the existing structure in place would be in N.R. and K.R.'s best interest, particularly in light of N.R.'s autism and Father's stated inability to make possession work on Thursdays based on his work schedule, and because we cannot conclude that a trial court abused its discretion merely because we would have ruled differently in the same circumstances, *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995), we hold that the trial court did not abuse its discretion by refusing to change the nonstandard possession schedule to standard possession. We overrule Mother's third issue, on the best interest ground of section 156.101(a), and do not reach her second issue on material and substantial change. *See* Tex. R. App. P. 47.4.

### IV. Conclusion

Having sustained Mother's first issue, we reverse the portion of the trial court's judgment pertaining to child support and remand the case for a new trial

20

on that issue. Having overruled Mother's third issue and having thereby not reached Mother's second issue, we are constrained by the applicable standard of review to affirm the remainder of the trial court's judgment.[12]

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and SUDDERTH, JJ.

LIVINGSTON, C.J.; and GABRIEL, J., concur without opinion.

DELIVERED: June 9, 2016

---

[12]Mother asked for standard possession in her petition and argued to the trial court that this would enable her to share some unstructured "fun" time with the children, such as the extracurricular activities described by Father as enjoyable to the children—sleepovers, movies, trips to the park, and going to church on Sundays—which would be impossible during Mother's periods of possession during the school year. As discussed above, the trial court did not abuse its discretion in denying Mother's request for standard possession. While Mother did not suggest any other alternatives to the trial court, we note that nothing prevented the trial court, in the interest of equity, from allowing Mother at least *some* weekends of possession during the school year, especially during those weekends when Father was on call and might otherwise be unavailable.