# Supreme Court of Texas

No. 21-0769

Angela Horton and Kevin Houser,

*Petitioners,*

v.

The Kansas City Southern Railway Company,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued January 31, 2023**

JUSTICE BOYD delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Devine, Justice Busby, Justice Bland, and Justice Huddle joined, and which Justice Blacklock and Justice Young joined as to Parts I, II, and III.

JUSTICE BUSBY filed a concurring opinion, in which Justice Devine, Justice Blacklock, and Justice Young joined.

JUSTICE YOUNG filed a dissenting opinion, in which Justice Blacklock joined.

Angela Horton and Kevin Houser (together, Horton) sued the Kansas City Southern Railway Company (KC Southern) for the

wrongful death of their mother, alleging KC Southern negligently maintained a railroad crossing by raising the crossing grade over time to form a "humped crossing" and by failing to replace a missing yield sign. In response to a single broad-form negligence question, the jury found both parties negligently caused the accident. In response to a separate question, the jury found the parties equally responsible. The trial court rendered judgment on the jury's verdict, awarding Horton fifty percent of the damages the jury found. The court of appeals held that the evidence supports a finding that the missing yield sign proximately caused the accident but that federal law preempts a negligence claim based on the humped crossing. 666 S.W.3d 1, 9, 10 (Tex. App.—Dallas 2021). Because the appellate court could not determine which of the two allegations the jury relied on when it found KC Southern negligent, it reversed the judgment and remanded for a new trial. *Id.* at 12.

Both parties sought review, which we granted. On June 30, 2023, we affirmed the court of appeals' judgment, but on different grounds. We held that (1) federal law does not preempt the humped-crossing claim and (2) no evidence supports the jury's finding that the absence of the yield sign proximately caused the accident. Like the court of appeals, but for the opposite reasons, we concluded that only one of the two allegations could support the jury's negligence finding, and we could not be certain which of the two allegations the jury relied on. We thus agreed with the court of appeals that the trial court's use of a broad-form question to submit the negligence claim constituted harmful error and that a new trial is required. But unlike the court of appeals, we

2

remanded for a new trial on the humped-crossing allegation rather than on the missing-yield-sign allegation.

Both parties filed motions for rehearing. On December 15, 2023, we denied KC Southern's motion and granted Horton's, which (among other arguments) urged us to reconsider our holding that the submission of the broad-form question constituted harmful error. We invited and received additional briefing on that issue from the parties and from various amici curiae.[1] Having reviewed that briefing and the authorities they address, we now agree with Horton. As in our original opinion, we hold that (1) federal law does not preempt the negligence claim based on the humped-crossing allegation and (2) no evidence supports a finding that the missing yield sign caused the accident. But we now conclude that the submission of the broad-form question did not constitute harmful error in this case. We therefore withdraw our June 30, 2023 opinion and judgment and issue this opinion. Because we do not find harmful error, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

## I.
## Background

A KC Southern train collided with Ladonna Sue Rigsby's pickup truck as she drove across a railroad track on a rural county road near her home. The track had been there for over a century, and KC Southern maintained it by lifting and adding materials under the rails and ties, incrementally raising the track over the course of many years. This

---

[1] We received amicus briefs on rehearing from (1) the Texas Association of Defense Counsel and American Trucking Associations, (2) Harvey Brown and W. Daryl Moore, and (3) David M. Gunn and Russell S. Post.

3

created a "humped crossing," with the mid-point rising around thirty inches above the level road thirty feet away. No signal lights, bells, or barrier gates protected the crossing, but "crossbuck" signs—white, X-shaped signs reading "Railroad Crossing"—marked the tracks from both directions. The posts holding those signs also previously included yield signs, but—for reasons no one could explain—the yield signs were missing at the time of Rigsby's accident.

According to a video of the accident recorded by a camera installed on the train, Rigsby slowed her vehicle to around seven miles per hour as she approached the track, and then to three or three-and-a-half miles per hour as she began to ascend the hump. Rigsby, who was deaf in her left ear, continued to cross the track as if she never saw or heard the train approaching from her left. She did not survive the collision.

Rigsby's adult children, Horton and Houser, sued KC Southern, alleging negligence based on the humped crossing and missing yield sign. KC Southern filed a summary-judgment motion, asserting, among other things, that federal law preempts Horton's claim. The trial court denied the motion, and KC Southern filed a motion for reconsideration, arguing federal law preempts Horton's claim at least to the extent it is based on the humped crossing. The trial court did not rule on that motion, and the case proceeded to trial.

The trial court submitted a single broad-form liability question to the jury, asking whether the negligence of Rigsby or KC Southern proximately caused the accident. KC Southern objected to the question, arguing the court should submit two separate negligence questions— one based on Horton's humped-crossing allegation and the other on the

4

missing-yield-sign allegation. The trial court overruled that objection. The jury found both Rigsby and KC Southern negligently caused the accident and assigned fifty percent of the responsibility to each. The trial court rendered a final judgment based on the verdict, awarding Horton $200,000 in damages.

KC Southern appealed, and the court of appeals reversed, with one justice dissenting. 666 S.W.3d at 4, 25. The court concluded the evidence supports negligence liability under the yield-sign allegation but federal law preempts the claim to the extent it is based on the humped-crossing allegation. *Id.* at 14–15. Because the court could not "determine whether the jury rested its liability determination on [Horton's] preempted humped crossing theory, which should not have been submitted, or the missing yield sign theory," it remanded the case for a new trial only on the yield-sign allegation. *Id.* at 18. Horton and KC Southern both filed petitions for review, which we granted.

## II.
## Preemption

We begin by addressing whether federal law preempts Horton's negligence claim based on the humped crossing.[2] The United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby." U.S. CONST. art. VI, cl. 2. As a result, federal statutes may preempt state laws and render them ineffective. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). They may do this expressly, by declaring that intent on the face

---

[2] KC Southern no longer argues federal law preempts the negligence claim to the extent it is based on the missing yield sign.

of the statute, *Arizona v. United States*, 567 U.S. 387, 399 (2012), or impliedly, by demonstrating an intent to "occup[y] the field" or creating an irreconcilable "conflict," *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (first quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983); and then quoting *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153 (1982)). KC Southern asserts—and the court of appeals agreed—that provisions of the federal ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified at 49 U.S.C. §§ 10101–16106), expressly and impliedly preempt Horton's humped-crossing claim. We disagree. To explain, we describe the ICCT Act and its relevant provisions, the separate Federal Rail Safety Act and its relationship to the ICCT Act, and other court decisions addressing preemption under the ICCT Act before turning to our own preemption analysis.

## A.    The ICCT Act

Congress enacted the ICCT Act "to reform economic regulation of transportation, and for other purposes." 109 Stat. at 803. The Act amended numerous federal statutes, including Subtitle IV of Title 49 of the United States Code, which addresses and governs interstate transportation. *Id.* at 803–04. Part A of Subtitle IV specifically addresses rail transportation. 49 U.S.C. §§ 10101–11908. KC Southern's contention that the Act preempts Horton's humped-crossing claim relies on this part, which we refer to as the Rail Provisions.

As part of its reform of "economic regulation of transportation," the ICCT Act abolished the Interstate Commerce Commission and created a new federal agency called the Surface Transportation Board, granting it "jurisdiction over transportation by rail carrier that

6

is . . . only by railroad" or, in some circumstances, "by railroad and water." 109 Stat. at 807; *see* 49 U.S.C. § 10501(a)(1). More specifically, Section 10501(b) grants the Surface Transportation Board "exclusive" jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in [the Rail Provisions] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b). Immediately following this jurisdictional grant, the section includes a preemption clause: "Except as otherwise provided in [the Rail Provisions], *the remedies provided under [the Rail Provisions] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law*." *Id.* (emphasis added).

The Act defines the term "rail carrier" to mean "a person providing common carrier railroad transportation for compensation." *Id.* § 10102(5). And it defines the term "transportation" to include a "facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail" and "services related to that movement." *Id.* § 10102(9). The parties here do not dispute that KC

Southern is a "rail carrier" and that its tracks and crossings qualify as "facilities" or "equipment," and thus "transportation."[3]

## B.      The Federal Rail Safety Act

The ICCT Act is not the only federal statute that addresses rail transportation. The Federal Rail Safety Act (the Safety Act) created a separate statute contained within Subtitle V of Title 49 of the United States Code. *See id.* §§ 20101–21311. The Safety Act directly addresses rail-safety concerns, as its express purpose "is to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." *Id.* § 20101. The Safety Act delegates rail-safety regulation to the federal Secretary of Transportation, not to the Surface Transportation Board. *Id.* § 20103. Because Horton alleges the humped crossing created safety issues, the Safety Act complicates the question of whether the ICCT Act preempts Horton's common-law negligence claim, particularly because the Safety Act contains its own preemption provisions that explicitly address common-law claims concerning safety issues.

---

[3] The Second Circuit has held that rail crossings do not qualify as a "facility" under the Act, *see Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 103 n.9 (2d Cir. 2009), and the Fifth Circuit has expressed similar skepticism, *see Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 411 (5th Cir. 2010). In this case, the dissenting opinion in the court of appeals expressed a similar concern that a broad construction of the term "facility" could preclude any state regulatory authority over any movement—by vehicles, bicycles, or pedestrians—over a rail crossing. 666 S.W.3d at 20 n.2 (Carlyle, J., dissenting). Because the parties here do not raise the issue, we assume without deciding that the Rail Provisions reach rail crossings, although that assumption does not affect our conclusions regarding the types of state laws Section 10501(b) preempts.

The Safety Act's preemption provisions permit states to adopt their own regulations governing rail safety but only if the state regulation is "not incompatible with" federal regulations and "does not unreasonably burden interstate commerce." *Id.* § 20106(a)(2); *see CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (holding federal regulations adopted under the Safety Act preempt state-law regulations "if the federal regulations substantially subsume the subject matter of the relevant state law"). In 2002, however, Congress amended the Safety Act to "clarify" that nothing in Section 20106 "shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage" if the action alleges that a party (a) "failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation," (b) "failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by" the Secretary, or (c) "failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2)." 49 U.S.C. § 20106(b). As a result, federal rail-safety regulations can provide the "standard of care by which a defendant's actions are judged for negligence." *Gallo v. Union Pac. R.R. Co.*, 372 F. Supp. 3d 470, 483 (W.D. Tex. 2019) (addressing cases). In the absence of a federal safety regulation covering the subject matter at issue, the Safety Act has no preemptive effect. *Id.* (citing *Easterwood*, 507 U.S. at 664).

Addressing the relationship between the Safety Act and the ICCT Act, courts have generally agreed that "the federal statutory scheme places principal federal regulatory authority for rail safety with the

9

Federal Railroad Administration . . . not the [Surface Transportation Board]" and thus the Safety Act "provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law." *Island Park*, 559 F.3d at 107; s*ee BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1195–96 (10th Cir.), *cert. denied sub nom. City of Edmond v. BNSF Ry. Co.*, 142 S. Ct. 2835 (2022). As the Sixth Circuit explained, the Federal Railroad Administration's and the Surface Transportation Board's "complementary exercise of their statutory authority accurately reflects Congress's intent for the [ICCT Act] and [the Safety Act] to be construed *in pari materia*," granting the Federal Railroad Administration "primary authority over rail safety matters" and subjecting state laws related to rail safety to "preemption analysis under the Safety Act," not under the ICCT Act. *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001). Moreover, the Safety Act specifically addresses safety issues affecting "grade crossings and railroad rights of way," which it expressly refers to as "the railroad grade crossing problem." *Iowa, Chi. & E. R.R. Corp. v. Washington County*, 384 F.3d 557, 559 (8th Cir. 2004) (quoting 49 U.S.C. § 20134(a)). As a result, the Safety Act, rather than the ICCT Act, appears to be the primary authority governing federal preemption of state-law claims addressing rail safety and, particularly, the safety of railroad crossings.

But the Safety Act and the ICCT Act have a "complicated" relationship, particularly "when a state action or common law claim falls at the intersection of [the ICCT Act's] realm of economic regulation and the [Safety Act]'s realm of safety regulation." *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 300 n.6 (5th Cir. 2017). The Surface Transportation

10

Board has suggested that "the overwhelming weight of precedent holds that safety issues are generally governed by [the Safety Act] preemption." *Jimmy Lee Waneck & Starr Swearingen Waneck, et al.-Petition for Declaratory Order*, FD 36167, 2018 WL 5723286, at *4 (S.T.B. Oct. 31, 2018) [hereinafter *Waneck Petition*]. Although "there can be rare cases when both the Safety Act and [the ICCT Act] preemption may apply," such cases do not include allegations of unsafe conditions at a railroad crossing.

KC Southern does not contend the Safety Act preempts Horton's humped-crossing negligence claim but instead asserts that the final sentence of Section 10501(b) of the ICCT Act expressly preempts Horton's claim because it would regulate KC Southern's construction, repair, and maintenance of the humped crossing. And in the event it does not, KC Southern contends the Rail Provisions impliedly preempt such claims. We must thus consider whether these facts provide one of the circumstances under which the ICCT Act may have a preemptive effect over a state-law rail-safety claim.

## C. Precedent

We are not the first to consider this thorny question. Numerous courts have addressed the scope of preemption under Section 10501(b) and have reached varying conclusions. Many have addressed the question of whether the section preempts state and local legislative enactments—particularly statutes, regulations, and ordinances—as opposed to state common-law claims like the negligence claim at issue in this case. Most of these have concluded Section 10501(b) expressly or

11

"completely"[4] preempts state and local legislation that attempts to "regulate," "manage," "govern," or "restrain" a rail carrier's "operations," or at least its operations "in the economic realm."[5] Conversely, others

[4] Many federal courts have analyzed preemption under Section 10501(b) to determine their jurisdiction under the federal removal statute. Under the "complete preemption doctrine," a state-law claim arises under federal law and can be removed to federal court if a federal statute wholly displaces the state-law claim. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). Although complete preemption and express preemption are not identical concepts, they are sufficiently similar to each other—and sufficiently distinct from implied (or "as-applied") preemption—to render the complete-preemption cases helpful guidance in this case.

[5] *See, e.g.*, *Hiett*, 22 F.4th at 1192 (holding Section 10501(b) expressly preempted a state statute regulating trains blocking track crossings because the statute "regulates railroad operations"); *Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 533 (5th Cir. 2012) (holding Section 10501(b) expressly preempted a city ordinance that prevented a rail carrier from expanding transloading operations because the ordinance dictated "construction design and layout of railroad tracks" and thus "would frustrate [the carrier's] economic decision making"); *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 807 (5th Cir. 2011) (holding Section 10501(b) expressly and completely preempted a state statute regulating trains blocking track crossings because the statute "is a direct attempt to manage [the rail carrier's] decisions in the economic realm"); *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (holding Section 10501(b) expressly preempted a state environmental-land-use statute requiring a pre-construction permit for a transloading facility because the statute restrained a rail carrier from developing its land); *see also State v. CSX Transp., Inc.*, 200 N.E.3d 215, 220 (Ohio 2022) (holding Section 10501(b) expressly preempted a state statute regulating trains blocking track crossings because the statute regulates, manages, and governs rail traffic); *A & W Props., Inc. v. Kan. City S. Ry. Co.*, 200 S.W.3d 342, 348 (Tex. App.—Dallas 2006, pet. denied) (holding Section 10501(b) expressly preempted a landowner's suit to enforce a rail carrier's alleged statutory obligation to widen a bridge and culvert to prevent flooding of the landowners' land because the statute would regulate rail operations); *Burlington N. & Santa Fe Ry. Co. v. City of Houston*, 171 S.W.3d 240, 248–49 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding Section 10501(b) preempted a state statute limiting a rail carrier's

12

have held Section 10501(b) does not expressly preempt state and local legislation that does not attempt to "regulate" or "interfere with" a rail carrier's operations.[6]

Several courts have also addressed Section 10501(b)'s preemptive effect on common-law claims, including claims for negligence,[7] trespass,

condemnation power and preempted a state paramount-purpose doctrine because they prevented the rail carrier from constructing and operating a rail line the Surface Transportation Board had approved).

[6] *See, e.g.*, *Island Park*, 559 F.3d at 103–04 (holding Section 10501(b) did not expressly preempt a state agency order requiring a rail carrier to close a private rail crossing because the order did not interfere with the carrier's operations); *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332–33 (5th Cir. 2008) (holding Section 10501(b) did not completely preempt a state law governing landowners' access across rail lines because local crossing disputes typically do not regulate carriers); *Iowa, Chi. & E. R.R. Corp.*, 384 F.3d at 561–62 (holding Section 10501(b) did not expressly preempt a state statute requiring rail carriers to construct and maintain safe bridges and crossings, at least absent evidence that the carrier obtains federal funding for such projects); *Fla. E. Coast Ry. Co. v. City of West Palm Beach*, 266 F.3d 1324, 1329, 1331 (11th Cir. 2001) (holding Section 10501(b) did not preempt a city zoning and licensing ordinance as applied to an aggregate company leasing land from a rail carrier because application "does not constitute 'regulation of rail transportation'").

[7] Courts have employed a different analysis when addressing negligence per se claims based on a rail carrier's alleged violation of a statute, regulation, or ordinance, usually holding Section 10501(b) preempts such claims when they are "based solely on [a] preempted state statute." *Elam*, 635 F.3d at 807; *see Ezell*, 866 F.3d at 299–301 (holding Section 10501(b) expressly preempted a negligence per se claim alleging violation of an anti-blocking statute); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002) ("Congress intended to preempt the Ohio state statutes, and any claims arising therefrom, to the extent that they intrude upon the [Surface Transportation Board's] exclusive jurisdiction over 'transportation by rail carriers' . . . ."); *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 443 (5th Cir. 2001) (holding Section 10501(b) preempted a negligence per se claim based on alleged violations of a state anti-blocking statute because "regulation of KCS

nuisance, and even inverse condemnation. Some have held that Section 10501(b) expressly preempted such common-law claims—which complained of noise and vibrations from a rail carrier's operations or of a train's speed, length, scheduling, use of side tracks, and extended blocking of crossings—because such claims (like the state and local legislation discussed above) sought to regulate, manage, or govern a rail carrier's operations or rail transportation.[8]

train operations, as well as the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the [Surface Transportation Board] unless some other provision in the [ICCT Act] provides otherwise"). We need not and do not address preemption of such negligence per se claims in this case.

[8] *See, e.g.*, *Ezell*, 866 F.3d at 299–300 (holding Section 10501(b) expressly preempted a negligence claim based on a train's blocking of a crossing because the claim would "economically regulate [the carrier's] switching operations" (quoting *Elam*, 635 F.3d at 807)); *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1145–46 (8th Cir. 2015) (holding Section 10501(b) expressly preempted a landowners' common-law claims for trespass, nuisance, negligence, inverse condemnation, and statutory trespass, alleging a rail carrier built embankments that caused flooding on the landowner's land, because the claims "would unreasonably burden or interfere with rail transportation"); *Franks*, 593 F.3d at 411 (stating Section 10501(b) would expressly preempt "a tort suit that attempts to mandate when trains can use tracks and stop on them" because the suit would "attempt[] to manage or govern rail transportation in a direct way"); *Friberg*, 267 F.3d at 444 (holding Section 10501(b) expressly preempts common-law claims seeking to impose liability for "a railroad's economic decisions such as those pertaining to train length, speed or scheduling"); *Rushing v. Kan. City S. Ry. Co.*, 194 F. Supp. 2d 493, 500 (S.D. Miss. 2001) (holding Section 10501(b) expressly preempted common-law nuisance and negligence claims complaining of a rail carrier's annoying switch-yard operations); *Guckenberg v. Wis. Cent. Ltd.*, 178 F. Supp. 2d 954, 959 (E.D. Wis. 2001) (holding Section 10501(b) expressly preempted a common-law nuisance claim complaining of a rail carrier's use of a side track because the claim would effectively regulate the carrier's operations); *A & W Props.*, 200 S.W.3d at 351 (holding Section 10501(b) expressly preempted a landowner's common-law nuisance, trespass, and negligence claims seeking to

Other courts, however, have held that Section 10501(b) does not expressly preempt common-law claims, for various reasons. Some concluded the rail carrier's allegedly negligent conduct was not the type of "transportation"-related conduct the Rail Provisions address and for which they provide remedies that carry preemptive power under Section 10501(b).[9] Others focused on the idea that an adverse judgment on a common-law claim would not necessarily require the carrier to alter its operations, *see Elam*, 635 F.3d at 813–14, or observed that a common-law claim seeking only compensatory damages does not attempt to "manage" or "govern" operations, even in the "economic realm," *id.* at 813.[10] And several concluded that common-law claims, by

force a rail carrier to widen a bridge and culvert to prevent flooding of the landowners' land because the claims would regulate the carrier's operations).

[9] *See, e.g., Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1131 (10th Cir. 2007) (holding Section 10501(b) did not expressly preempt claims for trespass, unjust enrichment, nuisance, and negligence based on a rail carrier's alleged dumping of used railroad ties and vegetation in a drainage culvert, causing flooding to the plaintiffs' land, because "these acts or omissions are not 'transportation' under § 10102(9)"); *Rushing*, 194 F. Supp. 2d at 501 (holding although Section 10501(b) expressly preempted negligence and nuisance claims complaining of noise and vibrations caused by a carrier's rail-yard operations, it did not preempt such claims complaining that a carrier's construction of a berm to minimize rail-yard noise resulted in flooding the plaintiff's property because the carrier's "design/construction of the berm does not directly relate to the manner in which the Defendant conducts its switching activities").

[10] *See Elam*, 635 F.3d at 813 (holding Section 10501(b) did not expressly preempt a negligent-failure-to-warn claim by a driver who drove into the side of a stopped train because a "typical negligence claim seeking damages for a typical crossing accident (such as the Elams' simple negligence claim) does not directly attempt to manage or govern a railroad's decisions in the economic realm"); *Rushing*, 194 F. Supp. 2d at 501 (holding Section 10501(b) did not expressly preempt negligence and nuisance claims complaining that a carrier's

their nature, do not "directly" address rail-carrier operations and instead have only an "incidental" effect on rail transportation. *See, e.g.*, *id.* (citing *Franks*, 593 F.3d at 411).

The Fifth Circuit focused on this direct-versus-incidental distinction in *Franks*, holding that Section 10501(b) did not expressly preempt a landowner's claim seeking to enforce a covenant in an easement deed to prevent a rail carrier from removing a track crossing on the landowner's land, explaining that the claim was "governed by Louisiana property laws and rules of civil procedure that have nothing to do with railroad crossings. Railroads are only affected when the [easement] happens to cross a railroad." 593 F.3d at 411. The same court later applied that distinction to conclude the ICCT Act did not expressly preempt a negligent-failure-to-warn claim, explaining that, "[l]ike state property laws and rules of civil procedure that generally 'have nothing to do with railroad crossings,' the effects of state negligence law on rail operations are merely incidental." *Elam*, 635 F.3d at 813 (quoting *Franks*, 593 F.3d at 411). As a Texas federal district court explained when applying this Fifth Circuit approach, although tort claims may "affect the management or governance of railroads if the railroad company is the tortfeasor, these claims arise under state common law

---

construction of a berm to minimize rail-yard noise resulted in flooding the plaintiffs' property because "an order by the Court directing the Defendant to compensate and correct drainage problems resulting from the construction of the berm would not implicate the type of economic regulation Congress was attempting to prescribe when it enacted the [ICCT Act]").

and are not intended to regulate railroad transportation even if they may incidentally affect it." *Gallo*, 372 F. Supp. 3d at 480.[11]

Two other federal district courts within the Fifth Circuit, however, have addressed "humped crossing" negligence claims like the one at issue here, and both concluded that Section 10501(b) expressly preempted such claims. Addressing claims by those injured and killed when a train struck a tour bus that got stuck on a humped crossing, a federal district court in Mississippi reasoned that the plaintiffs' negligent-maintenance claims were "tantamount to a claim regarding the design and construction of the crossing" and thus "directly attempt to manage or govern a railroad's decisions in the economic realm such as the construction and operation of tracks." *Waneck v. CSX Corp.*, No. 1:17CV106-HSO-JCG, 2018 WL 1546373, at *5 (S.D. Miss. Mar. 29, 2018). Addressing similar claims arising from a similar train–bus collision, a Texas federal district court reasoned that an adverse judgment would require "changes in design and construction of railroad tracks and crossings" and thus would "have the effect of managing or governing rail transportation in the economic realm." *Voight v. CSX Transp., Inc.*, No. 3:17-CV-01018-N, slip op. at 7, 9 (N.D. Tex. June 19, 2017).

A federal district court in Kentucky, however, expressly rejected the reasoning in *Voight* and *Waneck*, concluding that both "cases are

---

[11] *See Battley v. Great W. Cas. Ins. Co.*, No. CIV.A. 14-494-JJB, 2015 WL 1258147, at *4–5 (M.D. La. Mar. 18, 2015) ("[T]he plaintiffs' negligence claim [does not] challenge [the carrier's] general operating procedures," and a "judgment for the plaintiffs based on the circumstances presented in this case would have only an incidental and limited effect on rail transportation.").

inconsistent with Sixth Circuit and Supreme Court law on complete preemption." *Minton v. Paducah & Louisville Ry., Inc.*, 423 F. Supp. 3d 375, 383 (W.D. Ky. 2019). And the Surface Transportation Board itself rejected their reasoning in response to requests for administrative rulings from the parties involved in *Waneck. See Waneck Petition*, 2018 WL 5723286, at *4. According to the Board, the question of federal preemption of these types of humped-crossing claims "should be governed by the preemption provisions of the Federal Railway Safety Act . . . and not by 49 U.S.C. § 10501(b)." *Id.* at *1. Expressly rejecting the courts' holdings in *Voight* and *Waneck*, the Board opined that the plaintiffs' negligent-maintenance claims based on humped crossings "appear to be focused on purely safety-related issues" and thus "are not in direct conflict with the Board's exclusive jurisdiction over transportation that is part of the interstate rail network." *Id.* at *7.

Having described the ICCT Act's relevant provisions and its complex relationship with the Safety Act, as well as the broad array of precedent considering this question, we now turn to our own analysis of whether Section 10501(b) expressly or impliedly preempts Horton's humped-crossing claim. We agree with KC Southern that federal law can expressly preempt common-law negligence claims in some circumstances,[12] but we hold that the ICCT Act does not expressly

---

[12] It is well-established that federal law can preempt a state common-law negligence claim. *See Cont'l Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 282 (Tex. 1996); *see also Easterwood*, 507 U.S. at 676; *Ezell*, 866 F.3d at 298. But courts have applied presumptions both for and against federal preemption of state laws—particularly state common-law claims like negligence—that are relevant here. Courts presume, for example, that federal law does not preempt "the historic police powers of the State . . . unless that

preempt Horton's humped-crossing claim. We reach this conclusion based on the ICCT Act's clear language, which much of the precedent has underemphasized.

## D.     Express preemption

It is clear that Section 10501(b) expressly "preempts" *something*, but we must focus on the statute's language to determine the scope of

---

was the clear and manifest purpose of Congress" and that presumption "applies with particular force when Congress legislates in a field traditionally occupied by the states." *Altria*, 555 U.S. at 77 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). And as the Supreme Court noted long ago, "[t]he care of [railroad] grade crossings is peculiarly within the police power of the states." *Lehigh Valley R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 35 (1928). This presumption "is nowhere stronger than under circumstances in which a state is exercising" authority "in matters involving [its] citizens' public health and safety" because states have traditionally "exercised primary authority" in such matters. *Great Dane Trailers, Inc. v. Est. of Wells*, 52 S.W.3d 737, 743 (Tex. 2001) (first citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); and then citing *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 718–19 (1985)). Because common-law negligence claims "involve the state's power to regulate health and safety matters," overcoming the presumption against preemption of a negligence claim presents a "difficult burden." *Id.*

On the other hand, the presumption against preemption applies with less force when the federal statute addresses a field in which the federal government has historically been significantly involved, as is true for railroad regulation. *Elam*, 635 F.3d at 803–04. Congress and federal courts have long recognized a need for federal regulation of railroad operations. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). These considerations make the usual presumption against preemption somewhat hazy in the context of this case. But we are guided here by our previous recognition that, "while a federal requirement would ordinarily not preempt general state common law requirements such as a duty of care or a duty to warn in the abstract, a federal requirement would preempt a particularized application of such duties that imposed a specific 'standard of care or behavior' different or in addition to the federal requirement." *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 371 (Tex. 1998) (quoting *Medtronic*, 518 U.S. at 504–05 (Breyer, J., concurring)).

19

that preemption. "Where, as in this case, Congress has superseded state legislation by statute, our task is to 'identify the domain expressly pre-empted.' To do so, we focus first on the statutory language, 'which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (first quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001); and then quoting *Easterwood*, 507 U.S. at 664).

As noted, Section 10501(b) states that "the remedies provided" under the Rail Provisions "with respect to regulation of rail transportation" are "exclusive and preempt" the "remedies" provided under state law. 49 U.S.C. § 10501(b). In a statement other courts have often quoted, one federal district court suggested that it "is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996). We agree with the Eleventh Circuit, however, that "[a]lthough this subsection on its surface seems to provide for broad pre-emption, the text contains limitations on the reach of pre-emption." *West Palm Beach*, 266 F.3d at 1330. Specifically, the section grants preemptive power only to the "remedies" provided in the Rail Provisions "with respect to regulation of rail transportation." 49 U.S.C. § 10501(b). To determine the scope of preemption, we must explore the section's references to "remedies," "with respect to," and "regulation" of rail transportation.

### 1. "Remedies"

Section 10501(b)'s preemption clause uses "remedies" twice—first to describe what has preemptive power (remedies "provided under [the Rail Provisions] with respect to regulation of rail transportation"), and

then to describe what is preempted (remedies "provided under Federal or State law"). *Id.* Thus, per the clause's explicit text, the "remedies" that preempt state law are those provided in the Rail Provisions. The Rail Provisions provide "remedies" in Sections 11701 through 11708, including the recovery of "damages sustained by a person as a result of an act or omission of" a rail carrier "in violation of" the Rail Provisions. *Id.* § 11704(b). A person who sustains such damages as a result of a violation may assert a claim for those damages before the Surface Transportation Board and through a civil action to enforce the Board's order. *Id.* § 11704(c)(1)–(2), (d)(1)–(2).

Relying primarily on the ICCT Act's purpose and legislative history, some courts have concluded that the Rail Provisions' remedies address only *economic* regulation of rail transportation. *See, e.g.*, *Elam*, 635 F.3d at 805 (relying on legislative history to "observe Congress was particularly concerned about state *economic* regulation of railroads when it enacted the [ICCT Act]"). Based on this conclusion, they have construed Section 10501(b) to grant preemptive power to (and against) only "laws (and remedies based on such laws) that directly attempt to manage or govern a railroad's decisions *in the economic realm*." *Id.* at 807 (emphasis added).[13] Other courts have disagreed, *see, e.g.*, *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir.

---

[13] Although the *Elam* court acknowledged that the "preemptive effect of § 10501(b) may not be limited to state economic regulation," it nevertheless concluded that because "economic regulation is at the core of [the ICCT Act] preemption," it expressly and completely preempts only state laws that "directly attempt to manage or govern a railroad's decisions in the economic realm." 635 F.3d at 806–07.

2007) ("[The ICCT Act] does not preempt only explicit economic regulation."), as has the Surface Transportation Board, *see CSX Transp., Inc.—Petition for Declaratory Order*, Fed. Carr. Cas. (CCH) ¶ 37186, 2005 WL 584026, at *7–8 (S.T.B. Mar. 14, 2005) (concluding that Section 10501's preemption scope "is broader than just direct economic regulation of railroads" and that states and municipalities "cannot take an action that would have the effect of foreclosing or unduly restricting a railroad's ability to conduct its operations").

Based on the ICCT Act's text, we also disagree. The Act's introduction states that its purpose is "to reform economic regulation of transportation, *and for other purposes*," 109 Stat. at 803 (emphasis added), and we find nothing in its text that strictly limits its remedies to address only violations of "economic" regulations. Yet we note that, as even the Board has suggested, characterizing the ICCT Act as regulating "economic" operations can provide a helpful label for distinguishing between the ICCT Act and the Safety Act, which generally governs rail-safety issues, along with their respective preemption provisions. *See Waneck Petition*, 2018 WL 5723286, at *4 (agreeing that "safety issues are generally governed by [the Safety Act] preemption" but concluding "there can be rare cases when both [the Safety Act] and [the ICCT Act] preemption may apply"). In other words, whether we label[14] the ICCT Act's regulatory scope as "economic" or

---

[14] As the Second Circuit has explained, labels distinguishing between "economic" and other types of regulation, such as "environmental" regulation, are not particularly "useful" in this context because various types of regulation can and often do overlap. *Green Mountain*, 404 F.3d at 644–45 (explaining how a regulation labeled as "environmental" can "in fact amount to 'economic

22

merely "non-safety operational-related," as the Board has labeled it,[15] the important point is that the two Acts generally address different regulatory scopes, although they may overlap.

These observations about the remedies the Rail Provisions provide (in contrast to those the Safety Act provides) matter here because the types of state-law "remedies" Section 10501(b) preempts are the same types of federal-law remedies the Rail Provisions provide. Although the sentence does not expressly limit its reference to state-provided remedies to those "with respect to regulation of rail transportation," the sentence clearly imposes that limitation. *See, e.g.*, *Franks*, 593 F.3d at 410 (explaining that the preempted state-law "remedies receive their meaning from the earlier part of the sentence"). We thus conclude that Section 10501(b) grants preemptive power only to remedies provided in the Rail Provisions "with respect to regulation of rail transportation" and those remedies only preempt state-law remedies "with respect to regulation of rail transportation." We thus turn to the meaning of that limitation.

### 2. "With respect to regulation"

Consistent with the jurisdiction the ICCT Act grants exclusively to the Surface Transportation Board, the Rail Provisions address a rail

---

regulation' when it prevents a carrier from conducting economic activities" (quoting *City of Auburn*, 154 F.3d at 1031)).

[15] *Waneck Petition*, 2018 WL 5723286, at *7 (agreeing it can be "difficult for courts and the Board to draw the line between safety-related claims (subject to [the Safety Act] preemption) and non-safety operational-related claims (subject to [the ICCT Act] preemption)" (citing *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 914 N.W.2d 273, 289 (Iowa 2018))).

carrier's "rates, classifications, rules . . . , practices, routes, services, and facilities" and the "construction, acquisition, operation, abandonment, or discontinuance of" its tracks and facilities. 49 U.S.C. § 10501(b); *see Franks*, 593 F.3d at 409 (addressing the Act's exclusive remedies); *Jackson*, 500 F.3d at 252 (same). Section 10501(b), however, does not grant preemptive power to or against all laws that merely affect these types of activities, but instead grants such power only to and against remedies provided "with respect to regulation" of such activities.

Rather than encompassing any law that might indirectly touch on the relevant subject matter, the phrase "with respect to" limits the clause's preemptive effect so that it includes only those remedies that directly "concern" or "involve" the matter the clause describes. *Dan's City*, 569 U.S. at 261–62.[16] And the matter the clause describes— "regulation of rail transportation"—further narrows its preemptive scope. Section 10501(b) does not preempt "all state laws"[17] or even all

---

[16]*See also Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 8 (1st Cir. 2022) (holding a statute that preempted state laws "with respect to" a subject intentionally narrowed the scope of preemption to those laws that directly concern the subject matter), *cert. denied*, 143 S. Ct. 777 (2023); *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446 (2d Cir. 2015) (same).

[17] As the Eleventh Circuit has noted, *see West Palm Beach*, 266 F.3d at 1330, Section 11321 of the same chapter provides a helpful contrast. *See* 49 U.S.C. § 11321(a). There, the statute expressly provides that a rail carrier is exempt from "*all other law, including State and municipal law,*" as necessary to permit the carrier to participate in a corporate consolidation, merger, or acquisition the Surface Transportation Board has approved. *Id.* (emphasis added). As the Supreme Court has recognized, this language "is clear, broad, and unqualified." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 128 (1991). Section 10501(b), by contrast, does not preempt "all other law" but only state remedies "with respect to the regulation of rail transportation."

24

state-law remedies "with respect to rail transportation." Instead, it preempts state-law remedies with respect to "regulation of" rail transportation. 49 U.S.C. § 10501(b). The inclusion of the word "regulation" within the description of the section's preemptive scope "necessarily means something qualitatively different from remedies 'with respect to rail transportation.'" *West Palm Beach*, 266 F.3d at 1331.

Both the Supreme Court and this Court have recognized the narrow scope of a statutory reference to laws that "regulate" a subject matter. Concluding that an insured's common-law claims against an insurance carrier for breach of contract, breach of fiduciary duty, and fraud did not "regulate insurance," the Supreme Court explained that a "common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry but must be *specifically directed toward* that industry." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) (emphasis added).[18] And applying that same "common-sense view," we held that Texas laws that empower state-agency executives to discipline licensees for violations of other laws that "regulate" abortions are not themselves laws that regulate abortions because such laws are not "specifically directed toward" that subject. *Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 578 (Tex. 2022). Similarly, as discussed above, the Fifth Circuit has held that Section 10501(b) expressly preempts

---

[18] *See also Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 334 (2003); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365–66 (2002); *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358, 368 (1999); *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990).

state "laws that have the effect of *managing or governing* rail transportation." *Franks*, 593 F.3d at 410 (emphasis added).

Under this "common-sense view," a state statute that restricts the amount of time a train may block a crossing "regulates" rail transportation because the statute "homes in on 'railroad compan[ies]'" and "has no application" at all "except with respect to the operation of railroads at rail crossings." *Elam*, 635 F.3d at 807 (quoting MISS. CODE § 77–9–235). But general laws that are not specifically directed toward rail transportation, such as general state property laws, "are not meant to regulate railroad transportation, though at times they may have an incidental effect on railroad transportation." *Franks*, 593 F.3d at 411. The same is true of "standard building, fire, and electrical codes," which do not specifically "target[] the railroad industry," *Jackson*, 500 F.3d at 254, and even common-law contract laws, which enforce "[v]oluntary agreements between parties" and "are not presumptively regulatory acts," *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009). In the same way, a common-law negligence claim does not ordinarily "regulate" rail transportation because it is not specifically directed toward rail transportation and only incidentally affects rail transportation when the alleged tortfeasor happens to be a rail carrier.

As we have previously recognized, although "the term 'law' can include both common law and statutory law" and "jury awards can have an effect akin to regulation," generally, such a "regulatory effect is not as direct as that of positive enactments," and thus a federal law that preempted state "laws and regulations" did not preempt state common-law claims. *Moore v. Brunswick Bowling & Billiards Corp.*, 889

26

S.W.2d 246, 247, 249–50 (Tex. 1994) (holding the Federal Boat Safety Act did not preempt a "state law tort claim that a boat was defective because it lacked a propeller guard").[19]

The combination of these phrases, with their respective histories, is determinative, especially when considered within the context of the chapter that also includes the Safety Act. Section 10501(b) does not expressly preempt this common-law negligence claim. It may be, as

[19] We are aware, of course, of the Supreme Court's observations that state "regulation can be as effectively exerted through an award of damages as through some form of preventive relief" and that an "obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 246–47 (1959). And the Court quoted this principle again as part of its preemption analysis in *Cipollone*. 505 U.S. at 521. In this context, however, the text of Section 10501(b) indicates a narrower understanding of the term "regulation." Neither of those cases addressed a clause preempting state laws or remedies related to "regulation" of a subject matter, much less "with respect to" such "regulation." Because the federal law at issue in *Garmon* provided essentially no guidance on the scope of its preemptive effect, the Court based its decision in that case on its own perception of the federal law's "national purposes," 359 U.S. at 244, not on a statute that preempted state "regulation" of anything, *id.* at 240 (noting that the federal law "leaves much to the states, though Congress has refrained from telling us how much" (quoting *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776 (A.F.L.)*, 346 U.S. 485, 488 (1953))). Similarly, in *Cipollone*, the federal law at issue preempted any "*requirement or prohibition . . .* imposed under state law," not any state law that "regulated" the subject matter. 505 U.S. at 515 (emphasis added). The Court concluded this "broad" language, not any reference to "regulation," effected preemption of state common-law claims. *Id.* at 520. In fact, the Court recognized that a prior version of the federal law, which did not target state "requirements or prohibitions," "most naturally refers to positive enactments by those bodies, not to common-law damages actions" and thus preempted "rulemaking bodies from mandating particular cautionary statements and did not pre-empt state-law damages actions." *Id.* at 519–20. The prior law, the Court explained, was concerned not with "requirements or prohibitions" but with "'regulations'—positive enactments, rather than common-law damages actions." *Id.* at 521 n.19.

other courts have held, that a common-law claim could so directly seek to control, manage, or govern the core operational functions of a rail carrier that it could only be said to seek a "remedy with respect to regulation of rail transportation."[20] But in our view, negligence claims based on railroad-crossing safety will rarely meet that standard.

Considering Section 10501(b)'s language limiting its preemptive effect to "remedies" provided by state law "with respect to regulation" of rail transportation, the Safety Act's primary role in addressing rail-safety issues, and its clause expressly allowing certain common-law claims, we conclude that Section 10501(b) does not expressly preempt Horton's common-law claim that KC Southern negligently maintained the crossing resulting in an allegedly distracting and dangerous hump.

## E.    Implied Preemption

We now turn to the issue of whether Section 10501(b) impliedly preempts Horton's humped-crossing claim. As stated above, a federal law may impliedly preempt state law if Congress intended federal law to occupy the field exclusively or if the state law is in actual conflict with

---

[20] *See, e.g.*, *West Palm Beach*, 266 F.3d at 1331 (holding Section 10501(b) preempts "state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation" (quoting *Regulation*, BLACK'S LAW DICTIONARY (6th ed. 1990))); *Elam*, 635 F.3d at 805 (holding Section 10501(b) expressly preempts laws that "have the effect of managing or governing rail transportation" but not "generally applicable state laws that have a mere 'remote or incidental' effect on rail transportation" (quoting *Franks*, 593 F.3d at 410)); *City of Midlothian*, 669 F.3d at 532 ("[E]nactments that 'have the effect of managing or governing,' and not merely incidentally affecting, rail transportation are expressly or categorically preempted under the ICCTA." (quoting *Franks*, 593 F.3d at 410)).

and creates an obstacle for the federal law. *See Cipollone*, 505 U.S. at 545 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Within the context of the ICCT Act, courts have relied on the "conflict" prong of implied preemption to hold that Section 10501(b) may impliedly preempt a generally applicable state-law remedy if, as applied to a particular case, that remedy has the effect of "unreasonably burdening or interfering with rail transportation." *Elam*, 635 F.3d at 805 (quoting *Franks*, 593 F.3d at 410); *see CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 284 (6th Cir. 2019); *Tubbs*, 812 F.3d at 1145–46; *PCS Phosphate Co.*, 559 F.3d at 220–21; *Jackson*, 500 F.3d at 254; *Emerson*, 503 F.3d at 1133. We might question whether an unreasonable burden or interference, standing alone, is sufficient to create the kind of legal "conflict" required to establish implied preemption, but the parties here agree that this is the proper test in this context. So, for purposes of this case, and for the sake of consistency with courts across the country, we will apply this standard here, without suggesting that it provides the proper test for evaluating conflict preemption in other contexts.

A party arguing for implied preemption has the burden on that issue. *Mo. Pac. R.R. v. Limmer*, 299 S.W.3d 78, 84 (Tex. 2009). In the context of Section 10501(b) and a claim involving a rail crossing, this means the rail carrier must provide specific evidence regarding the crossing at issue rather than rely on assertions about the effect of grade crossings on rail transportation in general. *See Elam*, 635 F.3d at 813; *Franks*, 593 F.3d at 415. This requirement is consistent with the requirements of an "as-applied" preemption analysis, which considers the degree to which a specific scenario conflicts with requirements and

objectives of the federal law at issue. Thus, for example, evidence that private crossings can affect drainage, increase track maintenance costs, and cause trains to move at slower speeds, without evidence that the particular private crossing at issue would have those effects, is insufficient to establish the kind of unreasonable burden or interference necessary to trigger implied preemption. *Franks*, 593 F.3d at 415; *see Emerson*, 503 F.3d at 1133.

Here, Horton's negligence claim does not seek a court order requiring KC Southern to alter its operations. Horton sought only economic damages, not any sort of injunctive relief that could prevent KC Southern from maintaining the lines, crossings, services, rates, or other operations in which it was engaged at the time of Rigsby's death. Consistent with the typical purpose of a negligence claim, Horton sought only compensation for damages resulting from the accident. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 122 (Tex. 2009) ("A negligence claim . . . is about compensating an injured party.").

As KC Southern notes, however, the effect of a successful negligence claim can far exceed the payment of compensatory damages to a particular claimant. KC Southern contends that a successful claim in this case would effectively require KC Southern to alter all its humped crossings, or at least this particular line and crossing, and that requirement would unreasonably burden KC Southern or interfere with its operations. The trial court made no factual findings on this assertion, so we must presume the court resolved any factual disputes against preemption. *See Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex.

30

1996). Thus, KC Southern must conclusively demonstrate its contention as a matter of law. Nevertheless, even if we assume that KC Southern could have established an unreasonable burden or interference based on changes in its tracks and operations (as opposed to the damages award), we conclude KC Southern's evidence is insufficient here.

A lack of definitive evidence regarding costs and operational methods will render evidence insufficient to establish an unreasonable burden or interference as a matter of law. In *Gallo*, for example, the federal district court found the evidence of unreasonable burden was insufficient when the parties offered competing visions for how a railroad could remedy a potential drainage issue, and different cost estimates for those changes, without any clear evidence that the defendant's more burdensome proposed change was required. *See* 372 F. Supp. 3d at 481.

On the other hand, in *Union Pacific Railroad Co. v. Taylor Truck Line, Inc.*, No. 15-0074, 2018 WL 1750516 (W.D. La. Apr. 10, 2018), the railroad offered evidence that lowering the specific crossing at issue would require extensive studies and redesign of the drainage, signal circuits, and nearby crossings; rehabilitation of the switches, adjacent tracks, and drainage culverts; and extensive construction work at the crossing and three-quarters of a mile of track on both sides, at a cost of approximately $2,000,000. *Id.* at *7–8. It also provided evidence that the work would require closure of the mainline track through the area for at least three to four days, impacting five road crossings. *Id.* The court found this evidence, in the absence of any sufficient opposing evidence,

established that the change would pose an unreasonable burden and result in regulation of the railroad. *Id.* at \*8–9.

Here, KC Southern failed to provide such definitive evidence. At trial, Horton's railroad-maintenance expert, Allen Blackwell, testified without opposition that KC Southern could address the humped crossing either by lowering the track to the level of the county road or by raising the county road to create a gradual incline up to the track. KC Southern did not present its own expert or other specific evidence of the likely cost and burden of either option. Instead, it relied on Blackwell's deposition testimony that lowering the track might cost up to $300,000. But at trial, Blackwell testified that number was inaccurate and that the project would more likely cost between $50,000 to $150,000. Horton also offered evidence that the cost of removing the hump would be comparable to KC Southern's routine-maintenance process, which, incidentally, created the hump in the first place, saving KC Southern about $100,000 that could be deducted from the cost of removing the hump.

Even if this cost were unreasonable, courts have generally concluded that increased costs alone cannot create the type of "unreasonable" burden or interference necessary to trigger implied preemption. *See Barrois*, 533 F.3d at 335; *Adrian & Blissfield R.R. v. Village of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008); *City of Sebree*, 924 F.3d at 284–85. KC Southern therefore also relied on Horton's expert to describe the type of construction required to lower the track to the road level. Blackwell agreed that lowering the track by thirty-two inches—the amount required for KC Southern to comply with its own

adopted safety guidelines—would require "major revision to the alignment, elevation, or profile of the track." According to Blackwell, KC Southern would have to remove asphalt up to six feet away from each side of the track rails, cut and remove the rails and track panel at the crossing, resurface the crossing area with new ballast, pour new asphalt, and then install new crossing panels. The parties also agreed that KC Southern would need to extend the renovation out at least 661 feet on each side to maintain required evenness of the track. KC Southern's corporate representative testified that a culvert present under the track could make it impossible to lower the track by the full thirty-two inches. Thus, KC Southern argued this project would far exceed the scope and cost of a typical crossing rehabilitation.

On the other hand, Horton provided evidence that, despite the seemingly broad scope of work, it would take relatively little time. Blackwell testified that undercutting the track would take the same amount of time as a routine resurfacing (six to eight hours). He also specified that, to the extent work could not be completed in a day, KC Southern could run trains in the evening at a reduced speed, with subsequent speed and tonnage restrictions lasting no more than forty-eight hours. KC Southern did not contest this evidence.

All this evidence, however, addressed only one possible means of eliminating the hump. Other testimony established that KC Southern could address the safety issue by raising the county road on each side of the crossing. Blackwell testified that, while KC Southern would not have a sufficient right-of-way to complete that project alone, it would not be unusual for the railroad to coordinate with county and state authorities

to complete the work. KC Southern argued it could not alter the road alone but failed to dispute that it could do so in coordination with the county. More importantly, it offered no evidence regarding the probable costs and burdens of such a project.

We conclude that KC Southern did not meet its burden to establish that Horton's negligence claim complaining of the humped crossing would pose the "unreasonable burden or interference with rail transportation" required to trigger implied preemption under Section 10501(b). Even assuming we should consider more than the burden of the compensatory damages alone, KC Southern failed to provide definitive evidence of the cost of any of the possible solutions needed to eliminate the hazard at this specific crossing. And even if we assume, as KC Southern argues, that Horton's claim could require it to lower all the humps on all its crossings, it provided no evidence of those costs and burdens either.

The most specific evidence KC Southern presented to establish an "unreasonable" burden involved testimony that the curvature of this section of track, which was in a hilly area, would require undercutting a longer section of track than normal and would be further complicated by the presence of a flood-control culvert in the area. KC Southern's witness testified that this would not be "a very feasible function for us to perform." But even accepting KC Southern's assertions that lowering the track would exceed the scope of a typical crossing rehabilitation, KC Southern failed to contest Horton's evidence that lowering the track would close the track for less than a day and would only require weight and speed restrictions for forty-eight hours. As to the less burdensome

option of raising the road, KC Southern provided no evidence of possible delays associated with such a solution, nor did it successfully refute Horton's evidence that partnering with the local road authority for such a project would be routine.

We thus hold that KC Southern failed to meet its burden to establish that Section 10501(b) impliedly preempts Horton's humped-crossing negligence claim. And having also concluded that the section does not expressly preempt the claim, we hold that the court of appeals erred by holding that Section 10501(b) preempts Horton's claim that KC Southern negligently caused the accident by creating the humped crossing.

## III.
## Yield Sign

In addition to the complaint about the humped crossing, Horton also alleged that KC Southern negligently caused the accident by failing to ensure that yield signs remained in place on the posts containing the crossbuck signs at the crossing. KC Southern argues that no evidence could support a finding that the lack of a yield sign proximately caused the accident. We agree.

In reviewing the legal sufficiency of evidence to support a jury verdict, we honor the rule that the jurors "are the sole judges of the credibility of the witnesses and the weight to give their testimony," and it is their role to resolve any conflicts in the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 819–21 (Tex. 2005) (citations omitted). We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. We must consider the evidence "in the light most favorable to the verdict,

35

and indulge every reasonable inference that would support it," and we must credit any evidence that "allows of only one inference." *Id.* at 822 (citations omitted). We cannot substitute our judgment for the jury's. *Id.*

Through expert testimony and supporting studies and documents, Horton submitted the following evidence to support her missing-yield-sign allegation:

- Like a yield sign, "[t]he purpose of a crossbuck sign is to tell a motorist they need to yield." In a sense, it sends the same message as a yield sign. But it is "a more specific yield sign," specifically telling drivers "there's a railroad crossing" and they need to "yield for [a] train."

- "[S]tudies have shown that [a] crossbuck [sign] alone does not give the kind of warning . . . that reminds people that there is a potential train coming."

- This is because the same type of crossbuck sign is used at both active rail crossings (those with lights, bells, or protective gates that automatically warn a driver that a train is approaching) and passive crossings (those lacking such automatic signals). As a result, drivers "tend to regard the crossbuck sign as marking there's a railroad track here" and then rely on "active signals as being the devices that control whether they should stop or go through the crossing." So, at passive crossings, drivers "sometimes think the crossbuck sign merely marks the location of the grade crossing when, in fact, it . . . also needs to [warn drivers to] yield to trains."

- Because "research . . . showed road users do not fully comprehend the message being communicated by the crossbuck" sign, and because "there is an advantage for awareness improvement with the use of a yield sign," in 2009, federal law began requiring yield signs be posted along with crossbuck signs at passive crossings.

- Studies "indicate that [adding a] yield sign . . . conveys the message that the driver has the responsibility to look for and

yield to an oncoming train better than . . . the crossbuck alone."

- Adding the yield sign "adds awareness and it makes people recognize yield more than they recognize a crossbuck [sign]. So the combination together works well."

- This is particularly true for drivers who are not as familiar with the crossing. "[D]rivers who are crossing the tracks for the first time or very infrequently would be more prone to respond by slowing somewhat and more conscientious about searching for oncoming traffic." But drivers who cross the tracks "on a frequent basis" are likely to "eventually . . . revert back to [their] behavior before the yield sign was installed." Warnings "tend to be less effective" for those who "use the same crossing over and over."

We agree with Horton that this evidence would support a finding that adding a yield sign to an already existing crossbuck sign would help alert drivers and cause them to look for an oncoming train before actually crossing an otherwise unprotected track. And so conversely, we agree that the evidence would support a finding that the absence of the yield sign made it less likely that Rigsby would have looked and stopped for the train that struck her pickup. But it is not sufficient to support the finding Horton had to obtain to prevail on the yield-sign claim: that, more likely than not, the absence of the yield sign proximately caused Rigsby to proceed into the train's path.

Other evidence, which a reasonable juror could not have ignored, established that no studies or empirical data confirm that adding a yield sign helps reduce crashes. The literature on which the experts relied provides "little empirical basis regarding the change in crash rates at crossings with either a yield or a stop sign," and "no study has been conducted on crash effect when yield signs are used." As one report

37

explained, "[i]t is expected that this knowledge [a yield sign provides] should increase advanced searching [for oncoming trains], but how this apparent effectiveness carries over to actual locations, especially if most passive crossings were to have a yield sign, is a matter of conjecture."

A jury finding of proximate causation cannot be based on such "conjecture." Horton's expert conceded that he could not point to any study or evidence that the absence of the yield sign, "more likely than not, would have been a difference" for this accident. And he could not say that "this accident more likely than not would not have happened if the yield sign was present." Nor does any other evidence support such a finding. Horton's expert testified that, in his opinion, the addition of a yield sign more likely than not provides a more effective warning, but he based that opinion merely on the fact that the federal government recommended the addition of yield signs in 2000 and required them in 2009. This is not the type of basis that could support such an opinion, and the opinion itself was insufficient to support a finding that the absence of the yield sign more likely than not caused this particular accident.

As to this accident, the video recording confirms that Rigsby, who lived near the crossing and regularly crossed it for years up until she was hospitalized several weeks before the accident in fact did slow down as she approached the crossing, and then slowed even more, to three or three-and-a-half miles per hour, before reaching the rails. As Horton's expert confirmed, Rigsby "was cautious. She showed approach. It looked like she was intent. The purpose of those kind of signs and a warning sign is to alert that." We must conclude that no evidence supports a

finding that, more likely than not, Rigsby would have approached the crossing any more cautiously or intently had the yield sign been present or that the absence of the yield sign more likely than not caused Rigsby to drive into the train's path.

## IV.
## Harmless Error

To recap, we have rejected KC Southern's argument that the ICCT Act preempts liability on Horton's humped-crossing allegation, but we have agreed with KC Southern that no evidence supports liability on Horton's missing-yield-sign allegation. Horton attempted to prove that allegation and argued to the jury that she had done so, and the trial court's single broad-form question permitted the jury to find liability under either allegation. Because no evidence supported the yield-sign allegation, the trial court erred by submitting a question that allowed the jury to find liability based on that allegation. *See Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002) ("[T]he trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence.").[21] But an error in a jury charge does not require reversal unless the error was harmful. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).[22] We must decide whether the court's error was harmful in this case.

---

[21] *See also* TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence.").

[22] This case does not involve any type of error that is harmful per se or "as a matter of law." *See, e.g.*, *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 635–39 (Tex. 2023) (purposeful and unaddressed racial discrimination in

39

## A. The test for harm

Generally, a trial court's error is harmful if it either (1) probably caused the rendition of an improper judgment or (2) probably prevented the appealing party from properly presenting the case to the court of appeals. TEX. R. APP. P. 44.1(a) (governing court of appeals' review), 61.1 (governing Supreme Court review). To determine whether an error was harmful under either of the two prongs, the appellate court must consider the entire record of the case as a whole. *In re Est. of Poe*, 648 S.W.3d 277, 285–86 (Tex. 2022).[23] The court need not conclude that the

jury selection); *In re J.N.*, 670 S.W.3d 614, 619 (Tex. 2023) (denial of "constitutional rights basic to fair criminal trials, such as the deprivation of counsel, the denial of a public trial, or the refusal to honor a defendant's right of self-representation"); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 682 (Tex. 2008) ("jury argument . . . designed to incite passions of the jury and turn the jurors against defense counsel for doing what lawyers are ethically bound to do: advocate clients' interests within the bounds of law"); *In re K.R.*, 63 S.W.3d 796, 800 (Tex. 2001) ("total deprivation of an accused's right to counsel at trial, a trial before a judge who was not impartial, the unlawful exclusion of members of a defendant's race from the grand jury, the denial of an accused's right of self-representation, and the denial of a public trial"); *In re Union Pac. Res. Co.*, 969 S.W.2d 427, 428 (Tex. 1998) (trial before a disqualified judge); *Palmer Well Servs., Inc. v. Mack Trucks, Inc.*, 776 S.W.2d 575, 577 (Tex. 1989) (verdict supported by juror disqualified due to felony indictment).

[23] For example, to the extent they are relevant in a given case, the appellate court must consider the parties' pleadings, the specific theories asserted, whether the challenged theory was "critical to [the] case," statements made during voir dire, the evidence admitted and excluded, whether the admission or exclusion was "calculated or inadvertent," the relative strength and weakness of the evidence, whether the theory was "hotly" or "vigorously" contested, the jury charge "in its entirety," including all instructions and questions, counsels' closing arguments, any questions or reports the jury submitted to the court during deliberations, and whether the jury's verdict was unanimous. *See Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 587 (Tex. 2023); *In re Commitment of Jones*, 602 S.W.3d 908, 914 (Tex. 2020); *U-Haul*

error "necessarily" caused harm or reach its conclusion with certainty. *McCraw*, 828 S.W.2d at 758.[24] Instead, the question is whether the error "probably" caused harm under either of the two prongs. *See Jones*, 602 S.W.3d at 913.

Under the first prong, an erroneous jury charge probably results in an improper judgment when it confuses or misleads the jury in answering a question that is material to the judgment. *Est. of Poe*, 648 S.W.3d at 286.[25] But an erroneous question or instruction is not harmful if the record as a whole does not establish that the error probably resulted in an improper judgment.[26]

---

*Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012); *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 755–56 (Tex. 1998); *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986); *Lorusso v. Members Mut. Ins. Co.*, 603 S.W.2d 818, 821 (Tex. 1980).

[24] We have recognized the "impossibility" of imposing a more specific test and have instead required only that the reviewing court conclude that the error "probably" caused the asserted harm, entrusting "the matter to the sound discretion of the reviewing court." *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 145 (Tex. 2016); *see Lorusso*, 603 S.W.2d at 821.

[25] *See, e.g.*, *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 226 (Tex. 2010) (holding instruction on "producing cause" that erroneously excluded "but for" requirement was harmful because proper instruction "would have assisted the jury in resolving the disputed expert testimony at the crux of the case and, more importantly, would have stated the law accurately").

[26] *See supra* note 23 (listing potentially relevant considerations). For example, the submission of an erroneous question is harmless if the jury's answers to other questions support the trial court's judgment. *See Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980). Similarly, an erroneous failure to instruct the jury that it must find specific elements will not be

41

Under the second prong, the "proper inquiry" is whether the error probably prevents the appellant from making the showing required under the first prong. *Jones*, 602 S.W.3d at 914. When the error involves the jury charge, and the appellate court—after reviewing the entire record—is "'reasonably certain that the jury was not significantly influenced by' the error," the second prong is not met and the error was not harmful. *Id.* (quoting *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 227–28 (Tex. 2005)).

## B.    Presumption of harm under *Casteel*

As explained, the error in this case involves the trial court's submission of both of Horton's negligence allegations through a single broad-form jury question. Our rules have long required trial courts to submit issues to juries using broad-form questions "whenever feasible." TEX. R. CIV. P. 277.[27] This requirement, however, "is not absolute," and

---

harmful if undisputed evidence conclusively establishes those elements. *See Operation Rescue–Nat'l v. Planned Parenthood of Hous. and Se. Tex.*, 975 S.W.2d 546, 553 (Tex. 1998). The erroneous refusal of a broad-form question was not harmful when the granulated questions "contained the proper elements," "fairly submitted to the jury the disputed issues of fact," and "incorporated a correct legal standard." *H. E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex. 1992). And as we explain below, a broad-form question that merely allows the jury to consider a factually unsupported theory or allegation may not be harmful.

[27] Our previous rules, which required courts to submit all allegations "separately and distinctly," *Harris County*, 96 S.W.3d at 235, promoted a "complex and artificial proliferation of narrow special issues, especially in ordinary negligence cases," *Scott v. Atchison, Topeka & Santa Fe Ry. Co.*, 572 S.W.2d 273, 278 (Tex. 1978). Too often, separate submissions produced conflicting jury answers, resulting in unnecessary appeals and retrials. *Tex. Dep't of Hum. Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). By amending the rules to require the use of broad-form questions, we aimed to promote

we have recognized that broad-form questions are not always feasible. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000). We held in *Casteel* that the use of a broad-form question to submit multiple "theories of liability" was not feasible and in fact constituted error when one or more of the theories was legally "invalid." *Id.* at 381.

We also held that the error in *Casteel* was harmful under the harm test's second prong because we could not determine "whether the jury based its verdict on one or more of the invalid theories." *Id.* At best, we could conclude only "that some evidence *could* have supported the jury's conclusion on a legally valid theory." *Id.* We held that when a trial court erroneously submits a broad-form liability question that includes multiple theories, the error is harmful and a new trial is required if an appellate court "cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.*[28]

judicial economy by minimizing appeals and new trials and simplifying the process of crafting a proper jury charge, making the questions "easier for the jury to comprehend and answer." *Id.*; *see Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999).

[28] In light of that holding, we advised that "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277 by avoiding the need for a new trial when the basis for liability cannot be determined." *Casteel*, 22 S.W.3d at 390. Although this advice remains sound, we note that in many cases rephrasing the question or giving an instruction not to consider theories or allegations that are unpleaded, invalid, or lacking in evidentiary support can eliminate the error without the risk of confusion or conflicting answers that submitting separate questions can create. *See, e.g.*, *Benge v. Williams*, 548 S.W.3d 466, 474–76 (Tex. 2018) (holding it was error to deny a jury instruction not to consider an unpleaded negligence allegation); *Tex. Comm'n on Hum. Rts. v. Morrison*, 381 S.W.3d 533, 535–36 (Tex. 2012) (per curiam) (holding it was error to deny a request to rephrase an

We have since clarified that *Casteel* creates a *presumption* that the erroneous submission of valid and invalid theories in a broad-form question is harmful and requires reversal. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 728 (Tex. 2016) ("In some cases, such as preserved *Casteel* error, harm may be presumed.").[29] The presumption

employment-discrimination liability question to specify discriminatory termination rather than a term that encompassed actions that had not been administratively exhausted); *Hawley*, 284 S.W.3d at 863–65 (holding it was error to deny a limiting instruction that the jury should not consider actions of a doctor who was not the hospital's agent in determining hospital's liability). In this case, for example, the trial court would not have erred by submitting a broad-form negligence question if it had recognized that the evidence was legally insufficient to support liability on the missing-yield-sign allegation and included an instruction that the jury should not consider that allegation.

[29] The *Casteel* court did not use any form of the term "presume." Facially, *Casteel* simply held that the trial court's use of a broad-form jury question in that case constituted harmful error under Rule 61.1's second prong because the Court could not "determine whether the jury based its verdict on an improperly submitted invalid theory." 22 S.W.3d at 388. Nor did the Court treat *Casteel* as creating a presumption when we first applied it in *Harris County*. *See* 96 S.W.3d at 232–33 ("In *Casteel,* we ruled that when a single broad-form liability question commingles valid and invalid liability grounds and the appellant's objection is timely and specific, the error is harmful and a new trial is required *when* the appellate court cannot determine whether the jury based its verdict on an invalid theory." (emphasis added)).

We first suggested that *Casteel* creates a presumption in *Cortez v. HCCI–San Antonio, Inc.*, 159 S.W.3d 87, 91 (Tex. 2005) ("But as in *Casteel,* we cannot know for certain that his inclusion did not affect the verdict, so we presume harm."), and then expressly characterized it in that manner in *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) ("Under *Casteel* and *Harris County,* we presume that the error was harmful and reversible and a new trial required when we cannot determine whether the jury based its verdict solely on the improperly submitted invalid theory or damage element."). We have consistently treated *Casteel* as creating a presumption ever since. *See Benge*, 548 S.W.3d at 475 (referring to *Casteel*'s "presumption-of-harm rule"); *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 621 (Tex. 2014)

applies because a broad-form submission, by its very nature, can be expected to make it impossible to "determine whether the jury relied on an invalid theory." *Morrison*, 381 S.W.3d at 534–35. When *Casteel* applies, reviewing courts will presume that harm exists under the second prong of the harmful-error test: "the error 'probably prevented the petitioner from properly presenting the case to the appellate courts.'" *Urista*, 211 S.W.3d at 757 (quoting TEX. R. APP. P. 61.1(b)).[30]

---

("We held in *Casteel* that harmful error will be presumed when a broad-form jury question contains both valid and invalid theories of liability, and the jury's answer fails to specify on which theory it rests."); *Morrison*, 381 S.W.3d at 534–35 ("In *Casteel,* we held that error is presumed harmful and a new trial is required when a trial court submits a broad-form liability question containing both valid and invalid theories of liability because the appellate court cannot determine whether the jury relied on an invalid theory."); *Thota v. Young*, 366 S.W.3d 678, 680 (Tex. 2012) ("We have held that reversible error is presumed when a broad-form question submitted to the jury incorporates multiple theories of liability and one or more of those theories is invalid."); *Hawley*, 284 S.W.3d at 864 ("[In *Casteel*] we held that when a trial court submits a single broad-form liability question commingling valid and invalid theories of liability, the error is presumed harmful if an appellate court cannot determine whether the jury based its answer on an invalid theory.").

[30] Of course, the appellant must also have preserved its complaint in the trial court by timely and specifically objecting to the error in the proposed broad-form jury charge. *Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 211 (Tex. 2021); *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 228 n.17 (Tex. 2019); *Morrison*, 381 S.W.3d at 536; *Thota*, 366 S.W.3d at 691; *In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003); *In re B.L.D.*, 113 S.W.3d 340, 349–50 (Tex. 2003); *Harris County*, 96 S.W.3d at 236; *Casteel*, 22 S.W.3d at 389; *State Dep't. of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 240 (Tex. 1992) ("The objection must be specific enough to call the court's attention to the asserted error in the charge."). Here, KC Southern properly preserved its complaint by objecting to the trial court's broad-form question, arguing that it could permit the jury to find negligence on an invalid liability theory. It also tendered a proposed question that included two blanks for the jury to separately determine whether liability in negligence arose from the humped crossing or the missing yield sign.

A "presumption," however, is merely a legal rule that requires the court to reach a particular conclusion *absent contrary evidence. Sudduth v. Commonwealth Cnty. Mut. Ins. Co.*, 454 S.W.2d 196, 198 (Tex. 1970). When a party who would otherwise bear the burden of proof demonstrates that a presumption applies, the burden shifts and requires the other party to rebut the presumption. *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993).[31] Similarly, if an appellant who complains of jury-charge error establishes that *Casteel*'s presumed-harm rule applies, the burden shifts and requires the prevailing party to show, based on the record, that the alleged error does not probably prevent the appellant from presenting the appeal. If the prevailing party makes that showing, the presumption is rebutted and the court must determine whether the error was harmful based on a review of the record as a whole, "as it would . . . in any other case." *Saenz*, 873 S.W.2d at 359.

---

[31] *See, e.g., Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107–08 (Tex. 2018) (explaining how a non-settling defendant triggers the presumption of right to a settlement credit by introducing evidence of the settlement amount and thus shifts the burden to require the plaintiff to show amounts that should not be credited); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018) (explaining how a plaintiff triggers the presumption of employment discrimination by establishing a prima facie case and thus shifts the burden to require defendant to rebut the presumption by a showing legitimate, nondiscriminatory reason for an adverse employment action); *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 487 (Tex. 2016) (explaining how a landlord triggers the presumption that a tenant caused damage by showing that the premises were under tenant's control and thus shifts the burden to require tenant to prove otherwise); *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517–18 (Tex. 1997) (explaining how a defendant accused of malicious prosecution enjoys a presumption that he acted reasonably, in good faith, and with probable cause, requiring the plaintiff to bear burden of presenting contrary evidence).

So even when the presumption applies, it will be rebutted and the appellate court may conclude that the error was not harmful if, based on a review of the entire record, the court is "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Romero*, 166 S.W.3d at 227–28 (quoting *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984)). Conversely, if *Casteel*'s presumption does not apply, the reviewing court may still conclude that a charge error was harmful if it concludes that the error probably caused the rendition of an improper judgment or probably prevented the appealing party from properly presenting the case to the court of appeals. Tᴇx. R. Aᴘᴘ. P. 44.1(a), 61.1. That a legal presumption does not apply does not prevent a court from reaching the conclusion that would be presumed if it did.[32]

## C. When the *Casteel* presumption applies

Horton offers two related reasons why *Casteel*'s presumed-harm rule should not apply in this case. First, Horton argues that *Casteel* applies only when a broad-form liability question comingles two or more legal theories or causes of action, not when it submits a single cause of action (here, negligence) based on two or more alleged wrongful acts. Second, Horton argues that *Casteel* applies only when one or more of the

---

[32] Today's dissenting opinion accurately describes the rebuttable presumption of harm but contends our precedent does not support it. *Post* at 8–9 (Young, J., dissenting). It acknowledges that we have consistently characterized *Casteel* as creating a presumption in at least eight decisions since *Casteel* and *Harris County*, but it would discard our precedent on the assertion that the Court was merely using "loose language." *Id.* at 9. Our confidence in the Court's decision-making process, however, prohibits us from joining that conclusion.

47

commingled theories or allegations is *legally* invalid, not when it is legally valid but unsupported by legally sufficient evidence.

As discussed below, our precedent generally refutes Horton's first argument, although some of our decisions contain statements that at least appear to support it. And our precedent on Horton's second argument is admittedly even less clear. We will thus make some effort here to review and clarify our precedent. We ultimately reject Horton's first argument but agree with his second. We hold that *Casteel*'s presumed-harm rule (1) applies when a broad-form jury charge commingles valid and invalid theories *or* allegations and permits the jury to make a finding based on either one but (2) does not apply when a theory or allegation is "invalid" merely because it lacks legally sufficient evidentiary support. We emphasize, however, that this rule merely governs whether harm will be presumed. If the presumption does not apply (or is rebutted), the reviewing court must determine in light of the entire record whether the error was in fact harmful under Rules 44.1 and 61.1.

### 1. Horton's first argument: Theories and allegations

As explained, *Casteel* involved a broad-form question that asked whether the jury found the defendant liable on any one of several distinct "theories of liability." 22 S.W.3d at 388. Focusing on that language, Horton first argues that *Casteel* does not apply here because "[f]ailing to maintain tracks and failing to post a yield sign are different negligent acts, not separate theories of liability." In a couple of our decisions applying *Casteel*, we have made statements that support this argument. *See Thota*, 366 S.W.3d at 692 ("[T]his case involves a single liability theory—negligence—so *Casteel*'s multiple-liability-theory

analysis does not apply."); *Urista*, 211 S.W.3d at 757 ("When, as here, the broad-form questions submitted a single liability theory (negligence) to the jury, *Casteel*'s multiple-liability-theory analysis does not apply.").

In *Casteel*, however, the Court relied on and reaffirmed our prior decision in *Lancaster v. Fitch*, 246 S.W. 1015 (Tex. 1923), in which "the trial court submitted a single general negligence issue with instructions regarding three distinct theories of negligence liability." *Casteel*, 22 S.W.3d at 389. And since *Casteel*, we have repeatedly explained that its presumed-harm rule applies not just to the erroneous broad-form submission of liability theories or causes of action but to any erroneous broad-form charge that permits the jury to rely on a legally invalid theory or allegation presented to the jury.[33]

We expressly rejected Horton's first argument in *Benge*, holding that a trial court harmfully erred by refusing to instruct the jury not to consider the plaintiff's evidence and arguments regarding a negligence allegation the plaintiff did not assert in his pleadings. 548 S.W.3d at 476. We acknowledged that the broad-form question in *Benge*, unlike the one in *Casteel*, "did not include multiple theories, some valid and some invalid." *Id.* Instead, it "inquired about a single theory: negligence." *Id.*

---

[33] *See, e.g.*, *Hawley*, 284 S.W.3d at 865 (applying *Casteel*'s presumed-harm rule when a broad-form question allowed the jury to consider an independent contractor's acts for which the defendant could not be legally liable); *Romero*, 166 S.W.3d at 215 (applying presumption when an erroneous apportionment question permitted the jury to consider an invalid allegation when allocating legal responsibility among the parties); *Harris County*, 96 S.W.3d at 233–34 (rejecting court of appeals' restriction of *Casteel* to "the submission of an invalid liability theory" and holding that the presumed-harm rule applied when a trial court erroneously submitted a broad-form question that allowed the jury to award damages for multiple alleged losses).

at 475. But because the broad-form question, combined with the court's refusal to submit the requested instruction, permitted the jury to answer the question by finding "liability based on evidence that cannot support recovery," we held that "the same presumption-of-harm rule must be applied." *Id.*; *see Morrison*, 381 S.W.3d at 536 (applying *Casteel* presumption where broad-form question allowed the jury to find liability based on a jurisdictionally barred allegation).

Despite the statements in *Thota* and *Urista* to the contrary,[34] our decisions have not limited *Casteel*'s presumed-harm rule to cases in which a broad-form question submits multiple liability theories or causes of action. Instead, we have applied it in cases where a jury charge, as a whole, permits the jury to reach a finding based on a legally invalid theory *or* allegation presented to the jury.[35] In other words,

---

[34] We ultimately declined to apply *Casteel*'s presumed-harm rule in *Thota* because the errors in that case did not "prevent the harmed party from obtaining meaningful appellate review." 366 S.W.3d at 693. And we declined to apply it in *Urista* because the error in that case could not be addressed by "departing from broad-form submission and instead employing granulated submission." 211 S.W.3d at 756–57.

[35] *Compare Benge*, 548 S.W.3d at 475–76 (applying presumed-harm rule even though the jury question "inquired about a single theory: negligence" because the court's erroneous refusal of requested instruction permitted the jury to find negligence based on an allegation the plaintiff did not assert, and "we [could not] determine whether it was the basis for the jury's finding"), *and Hawley*, 284 S.W.3d at 864–65 (applying presumed-harm rule even though "negligence was the only theory of liability submitted" because the court's erroneous refusal of requested instruction permitted the jury to find the hospital liable based on an independent contractor's conduct and "there is no way for . . . an appellate court to tell if it did so"), *with Urista*, 211 S.W.3d at 757 (refusing to apply presumed-harm rule because the error resulting from submission of inferential rebuttal instruction was not due to improper broad-form question), *and Thota*, 366 S.W.3d at 692–93 (refusing to apply presumed-

*Casteel*'s presumed-harm rule applies when a jury charge permits a jury to "consider erroneous matters." *Harris County*, 96 S.W.3d at 233. We conceive of no reason to depart from this applicability standard, as it appropriately reflects the reality that a broad-form submission that combines both valid and invalid theories *or* allegations will often prevent appellate courts from determining whether the error caused the rendition of an improper judgment. *Casteel*, 22 S.W.3d at 390.

### 2. Horton's second argument: Allegations lacking evidentiary support

Horton's second argument is that *Casteel*'s presumed-harm rule does not—or, at least, should not—apply when a broad-form submission is erroneous only because it permits the jury to base a finding on a theory or allegation that is legally valid but lacks evidentiary support. Here, Horton contends, we should not presume that the broad-form submission of her negligence claim caused harmful error because the claim was legally valid and any error resulted only from our conclusion that no evidence supports the missing-yield-sign allegation.

Once again, our precedent is somewhat unclear and conflicting regarding this argument. On the one hand, many of our decisions include statements that the presumed-harm rule applies when a theory or allegation is "invalid" because it lacks evidentiary support.[36] But we

harm rule because error in asking the jury to decide the plaintiff's contributory negligence did not cause doubt or confusion about the jury's failure to find that defendant was negligent).

[36] *See Benge*, 548 S.W.3d at 475 ("[W]hen the question allows a finding of liability based on evidence that cannot support recovery, the same presumption-of-harm rule must be applied."); *Morrison*, 381 S.W.3d at 537 ("A broad-form question cannot be used to 'put before the jury issues that have no

recently expressly held otherwise in *Castillo*, 444 S.W.3d at 621. The jury question at issue in *Castillo* asked whether a fraudulent statement was "sent by or at the direction of the plaintiffs or their agents or representatives with knowledge it was false." *Id.* at 620–21. The plaintiffs argued that the presumed-harm rule applied because, although some evidence may have supported a finding that the plaintiffs' attorney sent the statement, there was no evidence that the plaintiffs themselves sent it. *Id.* at 621. We rejected the argument, concluding that it "misunderstands *Casteel*," which applies only "when one of the choices presented to the jury on a single, indiscernible question *is legally invalid.*" *Id.* (emphasis added). Because the plaintiffs argued only that the evidence was insufficient and did not "argue the legal invalidity" of the claim, we held "*Casteel* does not apply." *Id.*[37]

---

basis in the law or the evidence.'" (quoting *Romero,* 166 S.W.3d at 215)); *Thota*, 366 S.W.3d at 680 (confirming that *Harris County* applied *Casteel* "when the broad-form question commingle[d] damages elements that [were] unsupported by legally sufficient evidence"); *Urista*, 211 S.W.3d at 756 (explaining that *Harris County* "extended the *Casteel* holding to broad-form questions that commingle damage elements when an element is unsupported by legally sufficient evidence"); *Romero*, 166 S.W.3d at 215 (stating that "broad-form submission cannot be used to put before the jury issues that have no basis in the law *or the evidence*" and the benefits of broad-form submission "neither necessitate nor justify misleading the jury with legally *or factually* invalid claims" (emphases added)); *Harris County*, 96 S.W.3d at 231–35 (applying presumed-harm rule when broad-form damages question was erroneous because at least one element of damages lacked evidentiary support).

[37] Similarly, in *Schindler Elevator*, we did not rely on a presumption when determining that harm resulted when a trial court erroneously instructed a jury to consider an alternative *res ipsa loquitur* theory of negligence that was not supported by legally sufficient evidence. 670 S.W.3d at 586–87.

Our refusal to presume harm in *Castillo* reflects our recognition that the broad-form submission of valid and invalid theories or allegations is *less likely* to be harmful when the invalidity results *only* from a lack of legally sufficient evidence than when it results from legal invalidity. Harm may also be less likely if the jury charge merely presents the supported and unsupported theories or allegations as alternatives the jury may disregard, as in *Castillo*. But harm will be more likely if the trial court expressly instructs the jury that it must base a finding on a factually unsupported theory or allegation, which is what occurred in many of the cases that contain the kind of language on which Horton relies.[38] Such an instruction may support the ultimate conclusion that the error was harmful under Rules 44.1 and 61.1, even when harm is not presumed.

But when a theory or allegation is invalid only because no evidence supports it, harm is far less likely because nothing prevents the jury from reaching a valid and proper finding based on the evidence it heard. As we stated in *Romero*, "the error of including a factually unsupported claim in a broad-form jury question" is not "always

---

[38] *See, e.g.*, *Romero*, 166 S.W.3d at 225 (trial court instructed the jury "to apportion responsibility among [various parties], and in doing so, to consider" liability under a factually unsupported theory); *Harris County*, 96 S.W.3d at 231 (trial court instructed the jury to consider factually unsupported elements when determining amount of damages); *Hawley*, 284 S.W.3d at 864 (trial court "*affirmatively told* the jury that the hospital acted through its [agents]," which erroneously "allowed the jury to speculate whether Dr. Valencia was an agent of the hospital" (emphasis added)); *Lancaster*, 246 S.W. at 1015–17 (trial court instructed the jury that a negligent-defect allegation lacking evidentiary support "was alone a sufficient ground of recovery" and "specifically instructed [the jury] to find for [plaintiff] if the [equipment] was" negligently defective and caused the plaintiff's injury).

reversible" because "a jury may simply ignore a factor in the charge that lacks evidentiary support." 166 S.W.3d at 227. In this important sense, a broad-form submission that permits a jury to make a finding based on a legally invalid theory or allegation is far more likely to cause harm than a broad-form submission that merely permits a jury to make a finding based on a theory or allegation that is invalid only because it lacks evidentiary support.

For this reason, and in an effort to clarify the law and simplify the process, we hold that reviewing courts should not *presume* harm when a broad-form submission permits a jury to make a finding based on a theory or allegation that is invalid only because it lacks evidentiary support. Because the broad-form negligence question submitted in this case was erroneous only for that reason, we conclude that *Casteel*'s presumed-harm rule does not apply.

But we reiterate that the effect of our holding here is merely that appellate courts should not *presume* harm in such a case. Just as the applicability of the presumption does not compel the conclusion that the error was harmful, the fact that the presumption does not apply does not compel the conclusion that the error was not harmful. Whether the presumption applies (because a broad-form charge commingled legally valid theories or allegations with legally invalid theories or allegations) or does not apply (because the charge commingled valid theories or allegations with theories or allegations that were invalid only because the evidence did not support them), the parties may rely on the record to demonstrate that the error was or was not harmful. When they do, the ultimate question for the reviewing court is not whether the *Casteel*

presumption applies but whether a review of the entire record reveals that the erroneous charge probably caused an improper judgment or probably prevents the appellant from properly presenting the case on appeal. *See* TEX. R. APP. P. 44.1(a), 61.1.

The *Casteel* presumption of harm, in other words, may be helpful in some cases to demonstrate that a charge error was harmful under the second prong of the harm test under Rules 44.1 and 61.1. But courts and parties should not be unduly distracted by the issue of whether the presumption applies. After determining whether it applies, and assuming the parties point to the record to support their conflicting positions, reviewing courts should focus on the ultimate question of whether "a review of the entire record provides [a] clear indication that the contested charge issues probably caused the rendition of an improper judgment." *Thota*, 366 S.W.3d at 687. Focusing on that ultimate issue, reviewing courts should explain in their opinions why the record as a whole does or does not establish harm in each particular case. *Cf. Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (directing that factual sufficiency review be clearly explained in detail). We turn now to that analysis based on the record in this case.

**D.    Application of harm test**

Having concluded that we should not presume harm in this case because the missing-yield-sign allegation was invalid only because no legally sufficient evidence supported it, we must nevertheless determine whether the erroneous negligence question was harmful under Rule 61.1. Based on our review of the entire record, we conclude that the trial court's erroneous submission of Horton's negligence allegations through a broad-form question did not probably cause the rendition of

an improper judgment. To the contrary, based on our review of the entire record, we are "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Romero*, 166 S.W.3d at 227–28.

In reaching this conclusion, we consider it important that Horton's counsel focused his trial presentation primarily on the humped-crossing allegation, comparatively neglecting the yield-sign allegation. During his opening statement, in fact, he acknowledged to the jury that "the worst thing [KC Southern] did wasn't the yield sign," it was the failure to maintain the hump to "no more than three inches high." The evidence and arguments Horton offered to support the yield-sign allegation, in addition to being legally insufficient to support causation, were also minimal in comparison to her presentation regarding the humped crossing. As KC Southern's counsel characterized the trial during oral argument in this Court, "90% of the testimony" dealt with the humped-crossing allegation and there was only a "half mention of the yield sign."

Moreover, KC Southern does not dispute that Horton offered substantial evidence supporting her claim that KC Southern negligently created the humped crossing and thereby caused the accident. This evidence indicated that the crossing was not merely humped but that it was some ten times higher than it should have been. KC Southern has argued unsuccessfully that federal law preempts any liability based on that allegation, but it has not argued that the evidence does not support a finding that it negligently created the hump or that the hump caused the accident.

We also note that the jury charge did not instruct the jury that it could find negligence based on the missing yield sign or otherwise suggest that it could do so. Unlike the jury charges in *Romero*, *Harris County*, *Hawley*, and *Lancaster*, the charge at issue here did not mention the missing yield sign at all, much less lead the jury to believe that it should or could find liability based on that allegation. Ultimately, the jury (on a 10–2 vote) found KC Southern and Rigsby were both negligent and equally responsible for causing the accident, and the trial court rendered judgment on that verdict awarding Horton $200,000.

Based on this record, we cannot say that the judgment is probably improper, and we are instead reasonably certain that the jury was not significantly influenced by the erroneous broad-form submission. In essence, we conclude that this case is like *Castillo*, in which the jury could, and probably did, "simply ignore a factor in the charge that lacks evidentiary support," and not like *Romero*, where the jury was "as misled by the inclusion of a claim without evidentiary support as by a legally erroneous instruction." *Romero*, 166 S.W.3d at 227. We thus conclude that the submission of the broad-form negligence question, although erroneous, did not cause the rendition of an improper judgment and thus did not constitute harmful or reversible error.

## V.
## Conclusion

We hold that the ICCT Act does not expressly preempt Horton's humped-crossing negligence claim, that KC Southern failed to bear its burden of proving that the Act impliedly preempts that claim, and that the evidence is legally insufficient to support liability based on Horton's missing-yield-sign negligence claim. Because we also conclude the trial

57

court's erroneous use of a broad-form question to submit Horton's negligence claim did not constitute harmful error, we reverse the court of appeals' judgment and reinstate the trial court's judgment.

_____

Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** June 28, 2024